UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>v.<br><br>ERNST JACOB and SHIPOWNERS INSURANCE AND GUARANTY COMPANY LTD,<br><br>Defendants. | Civil Action No. 3:21-cv-1594 |

**COMPLAINT**

United States of America, by the authority of the Attorney General of the United States and acting on behalf of the United States Coast Guard and the National Oceanic and Atmospheric Administration, files this Complaint and alleges as follows:

**NATURE OF THE ACTION**

1. In April 2006, the *T/V Margara*—a 748-foot tanker carrying more than 300,000 barrels of oil—grounded about three miles off the coast of Tallaboa, Puerto Rico. Response efforts necessary to free the vessel and guide it safely to port resulted in the destruction or destabilization of nearly 7,000 square meters of coral reef.

2. The United States brings this civil action against Defendants Ernst Jacob (GMbh & Co. KG) (ErnstJacob) and Shipowners Insurance & Guaranty Company, Ltd. (SIGCo) for the recovery of natural resource damages resulting from the substantial threat of a discharge of oil

1

from the grounding of the *T/V Margara* in navigable waters under Section 1002 of the Oil Pollution Act (OPA), 33 U.S.C. § 2702. Specifically, the United States seeks (1) reimbursement of natural resource damages already paid by the Oil Spill Liability Trust Fund to NOAA pursuant to OPA §§ 1006(a) and 1015(c),  33 U.S.C. §§ 2706(a) and 2715(c); and (2) a declaratory judgment against Defendants on liability for all uncompensated natural resource damages that occurred as a result of response actions to the substantial threat of discharge of oil posed by the *T/V Margara* grounding incident under OPA § 1017(f)(2), 33 U.S.C. § 2717(f)(2), including damages sufficient to complete the restoration, rehabilitation, replacement, or acquisition of the equivalent of the injured coral and associated natural resources, and to compensate for the diminished value of the injured coral and related natural resource between the grounding of the *T/V Margara* and full restoration or recovery of those injured resources, as well as additional reasonable costs of assessing those damages.

## JURISDICTION AND VENUE

3. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1345 and Section 1017(b) of OPA, 33 U.S.C. § 2717(b).

4. Venue is proper in this District under Section 1017(b) of OPA, 33 U.S.C. § 2717(b), and under 28 U.S.C. §§ 1391 and 1395(a), because the Defendants conducted business in this District and the incident that give rise to these claims occurred in this District.

## STATUTORY BACKGROUND

**Liability for Natural Resource Damages Under Section 1002 of the Oil Pollution Act**

5. Congress enacted OPA, codified at 33 U.S.C. §§ 2701–2761, in 1990.

6. Congress' principal purposes in passing OPA included establishing a fund to pay for response and removal costs associated with the discharge or a substantial threat of a discharge of oil, and to compensate parties suffering damages from actual or threatened discharges of oil. S. Rep. No. 101-94 (1989), *as reprinted in* 1990 U.S.C.C.A.N. 722. Congress designed OPA to provide protection for the environment and to aid the victims of oil spills. *Id.*

7. Section 1002(a) of OPA, provides:

> Notwithstanding any other provision or rule of law . . . each responsible party for a vessel . . . which poses the substantial threat of a discharge of oil[] into or upon the navigable waters or adjoining shorelines or the exclusive economic zone is liable for the removal costs and damages specified in subsection (b) of this section that result from such incident.

33 U.S.C. § 2702(a).

8. Subsection (b) then describes the various categories of damages referred to in subsection (a), including:

> **Natural Resources**
> Damages for injury to, destruction of, loss of, or loss of use of, natural resources, including the reasonable costs of assessing the damage, which shall be recoverable by a United States trustee . . . .

OPA § 1002(b)(2)(A), 33 U.S.C. § 2702(b)(2)(A).

9. OPA defines "damages" to mean those damages specified in Section 1002(b), 33 U.S.C. § 2702(b), which includes "the cost of assessing these damages." OPA § 1001(5), 33 U.S.C. §2701(5).

10. OPA defines "natural resources" to include "land, fish, wildlife, biota, air, water, ground water, drinking water supplies, and other such resources belonging to, managed by, held in trust by, appertaining to, or otherwise controlled by the United States (including the resources of the exclusive economic zone), any State or local government or Indian tribe, or any foreign government." OPA § 1001(20), 33 U.S.C. § 2701(20).

3

11. OPA defines "incident" as "any occurrence or series of occurrences having the same origin, involving one or more vessels, facilities, or any combination thereof, resulting in the discharge or substantial threat of discharge of oil." OPA § 1001(14), 33 U.S.C. § 2701(14).

12. OPA defines "responsible party" to include "[i]n the case of a vessel, any person owning, operating, or demise chartering a vessel." OPA § 1001(32), 33 U.S.C. § 2701(32).

13. OPA defines "vessel" as "every description of watercraft or other artificial contrivance used or capable of being used, as a means of transportation on water, other than a public vessel." OPA § 1001(37), 33 U.S.C. § 2701(37).

14. OPA defines "tank vessel" as a "vessel that is constructed or adapted to carry, or that carries, oil or hazardous material in bulk as cargo or cargo residue, and that … operates on the navigable waters." OPA § 1001(34), 33 U.S.C. § 2701(34).

15. As an alternative to recovering damages from a responsible party, OPA allows for claimants to recover damages from a responsible party's guarantor. OPA § 1006(f)(1), 33 U.S.C. §§ 2716(f)(1).

16. OPA defines "guarantor" as "any person, other than the responsible party, who provides evidence of financial responsibility for a responsible party under" the Act. OPA § 1001(13), 33 U.S.C. § 2701(13).

17. OPA does not specifically define "substantial threat." However, the Tank Vessel Response Plans for Oil regulations promulgated by the Coast Guard in accordance with OPA specify that a "substantial threat of discharge" is "any incident involving a vessel that may create a significant risk of discharge of cargo oil. Such incidents include…groundings." 33 C.F.R. § 155.1020.

18. Under OPA and its implementing regulations, a Federal On-Scene Coordinator (FOSC) is the official who designates the source of a discharge or threatened discharge and initiates appropriate activities to be taken in response to a discharge or substantial threat of discharge. OPA § 1014(a), 33 U.S.C. § 2714(a); 40 C.F.R. §§ 300.120, 300.130(c).

19. Pursuant to Section 1006 of OPA, 33 U.S.C. § 2706(b), the National Oceanic Atmospheric Administration (NOAA), a bureau of the Department of Commerce, has been designated as the federal trustee for, among other things, "natural resources managed or controlled by other federal agencies and that are found in, under, or using waters navigable by deep draft vessels, tidally influenced waters, or waters of the contiguous zone, the exclusive economic zone, and the outer continental shelf." 40 C.F.R. § 300.600.

20. Section 1006(c) of OPA describes the functions of federal trustees. 33 U.S.C. § 2706(c)(1). In particular, the section states that such trustees "shall assess natural resource damages under section 2702(b)(2)(A)," and "develop and implement a plan for the restoration . . . of the natural resources under their trusteeship." *Id*. A trustee's determinations and assessments of damages to natural resources "have the force and effect of a rebuttable presumption on behalf of the trustee in any administrative or judicial proceeding" under OPA. 33 U.S.C. § 2706(e)(2).

21. Applicable regulations define "restoration" as follows:

> *Restoration* means any action (or alternative), or combination of actions (or alternatives), to restore, rehabilitate, replace, or acquire the equivalent of injured natural resources and services. Restoration includes:
>
> (a) *Primary restoration,* which is any action, including natural recovery, that returns injured natural resources and services to baseline; and
>
> (b) *Compensatory restoration,* which is any action taken to compensate for interim losses of natural resources and services that occur from the date of the incident until recovery

15 C.F.R. § 990.30 (italics original).

22.     Trustees "may determine appropriate restoration of injured natural resources and services, where such injuries are not fully addressed by response actions. Response actions and the coordination with damage assessment activities are conducted pursuant to the National Oil and Hazardous Substances Pollution Contingency Plan (NCP), 40 CFR part 300." 15 C.F.R. 990.21; *accord* Executive Order 12777, 56 Fed. Reg. 54,757, 54,767 (October 18, 1991) (delegating to federal trustees certain authorities vested in the President by OPA § 1012(a) with respect to "the payment of costs and determining consistency with the NCP," including costs incurred "for assessing natural resource damages and for developing and implementing plans for [their] restoration . . .").

**Subrogated Claims Under Section 1015 of the Oil Pollution Act**

23.     Rather than recover natural resource damages from responsible parties directly, trustees can elect to submit claims for uncompensated damages to the Oil Spill Liability Trust Fund (the "Fund" in OPA parlance). OPA §§ 1001(11), 1012, 1013; 33 U.S.C. §§ 2701(11), 2712, 2713.

24.     Specifically, OPA provides that the Fund shall be available to pay claims for "uncompensated damages" as well as claims for "uncompensated removal costs determined by the President to be consistent with the [NCP]." OPA § 1012(a)(4), 33 U.S.C. § 2712(a)(4). *See also* 15 C.F.R. § 990.62 and .64 (describing process for trustees to seek compensation for assessed natural resource damages from the Fund); 33 C.F.R. §§136.207–211 (identifying the requirements for submitting a claim to the Fund).

25.     Executive Order 12777 delegated to the Coast Guard those authorities vested in the President by Section 1012(a) of OPA, 33. U.S.C. § 2712(a), with respect to the payment of costs and damages, including "the authority to process, settle, and administratively adjudicate

such costs, damages, and claims, regardless of amount." 56 Fed. Reg. 54,757, 54,767 (October 18, 1991).

26. The Coast Guard's National Pollution Funds Center (NPFC) administers the Fund. *See* 33 C.F.R. Part 136.

27. Section 1015(a) of OPA provides:

> Any person, including the Fund, who pays compensation pursuant to this Act to any claimant for removal costs or damages shall be subrogated to all rights, claims, and causes of actions the claimant has under any other law.

33 U.S.C. § 2715(a).

28. OPA allows claims for damages to be pursued and recovered in increments as their scope becomes evident. In particular, Section 1015(b)(1) describes the application for and subrogation of claims for "interim damages":

> If . . . the Fund has made payment to a claimant for interim, short-term damages representing less than the full amount of damages to which the claimant may be entitled, subrogation under subsection (a) of this section shall apply only with respect to the portion of the claim reflected in the paid interim claim.

33 U.S.C. § 2715(b)(1).

29. OPA provides that, in any action for removal costs or damages related to an incident, "the court shall enter a declaratory judgment on liability for removal costs or damages that will be binding on any subsequent action or actions to recover further removal costs or damages." OPA § 1017(f)(2), 33 U.S.C. § 2717(f)(2).

## GENERAL FACTUAL ALLEGATIONS

### A. The Defendants' Relationship to the *T/V Margara*

30. The *T/V Margara*'s Certificate of Financial Responsibility listed ErnstJacob as the vessel's owner.

31. At the time of the incident and at all times pertinent to this case, EnrstJacob owned or operated the *T/V Margara*.

32. The *T/V Margara*'s Certificate of Financial Responsibility listed SIGCo as a responsible party's guarantor.

33. At the time of the incident and at all times pertinent to this case, SIGCo had provided evidence of financial responsibility for one or more responsible parties with respect to the ownership and/or operation of *T/V Margara*.

### B. The *T/V Margara* Incident and Response

34. On or about April 27, 2006 at 12:30 am, the *T/V Margara* grounded approximately three miles off the coast of Tallaboa, Puerto Rico.

35. At the time of the grounding, the *T/V Margara* did not have a local pilot aboard.

36. The *T/V Margara*, a 748-foot tanker, was carrying approximately 315,693 barrels of #6 fuel oil when it grounded.

37. The *T/V Margara* grounded in an area of dense coral reefs.

38. The ship's Master activated its Vessel Response Plan.

39. The U.S. Coast Guard's Sector San Jan was notified of the grounding. The Coast Guard directed the *T/V Margara* to cease any efforts to come off the reef and mobilized at least thirteen Coast Guard personnel to the site along with equipment.

40. Coast Guard personnel established a unified command post from which to assess the situation, develop salvage plans, and oversee any necessary response effort.

41. The *T/V Margara* was hard aground.

42. The vessel was lifted and listing.

43. The vessel's position on the reef left it exposed to changes in seas and weather.

44. The vessel's decrease in draft indicated that its hull could have been under strains for which it was not designed.

45. Early reports also indicated that the vessel's hull had been damaged, though the extent of the damage was unknown.

46. The Federal On-Scene Coordinator (FOSC) determined that the *T/V Margara* posed a substantial threat of discharging its oil into surrounding waters.

47. On or about April 27, 2006 at 6:00 am, representatives of the Coast Guard presented the Master of the *T/V Margara* with a "Notice of Federal Interest For An Oil Spill Incident," which was signed by the FOSC and which declared: "On or about 27 April 2006 an oil pollution incident occurred or threatens to occur at Tallaboa Bay, Puerto Rico."

48. By around 12:00 pm, contingency booms were placed around the *T/V Margara* to absorb oil or other hazardous substances in the event of a spill, and a 600-yard safety zone was established around the vessel.

49. At the direction of the FOSC, attempts were made to free the *T/V Margara* from the reef. Those efforts, which rotated the vessel 90 degrees, used the vessel's own power, tug assists, and the rising tide to try to free the boat.

50. The *T/V Margara* was refloated for a short time that afternoon, but soon regrounded on a separate section of the reef.

51. The *T/V Margara* regrounded in an area to the north and west of the original grounding.

52. This second grounding occurred during the response to *T/V Margara*'s initial grounding, which was overseen by the FOSC, and again impacted an area of dense coral reefs.

53. At approximately 5:30 a.m. on April 28, the *T/V Margara* was successfully refloated with the assistance of standby tugs and directed to deeper waters for evaluation.

54. The *T/V Margara* incident injured natural resources under the trusteeship of the United States and Puerto Rico, including nearly 7,000 square meters of coral reef.

**C.     Natural Resource Damages – Interim Assessment of Primary Restoration Costs**

55. Following the *T/V Margara* incident, NOAA, along with the Puerto Rico Department of Natural and Environmental Resources (together "Trustees"), notified ErnstJacob of their intent to pursue a natural resources damage assessment, which ErnstJacob acknowledged.

56. The Trustees began working with ErnstJacob's representative Independent Maritime Consulting (IMC) and on or about May 12, 2006, the Trustees met with IMC to discuss injury assessment.

57. ErnstJacob and one of its insurers, Norwegian Hull Club, funded emergency restoration activities at the site of the *T/V Margara* incident.

58. The Trustees worked cooperatively with ErnstJacob, NHC, and IMC to identify and perform emergency restoration and to undertake natural resource damage assessment for several years.

59. As part of the assessment process, the Trustees determined that a combination of primary and compensatory restoration would best address the natural resource damages suffered by the public as a result of the *T/V Margara* incident. Because the scope and scale of primary restoration has a direct effect on the interim loss and, in turn, the calculation of compensatory restoration, the Trustees determined a two-step approach was appropriate whereby they would

finalize a recovery for primary restoration and then assess and implement necessary compensatory restoration.

60. In May 2014, Norwegian Hull Club notified the Trustees that an operating company associated with a responsible party had initiated insolvency proceedings.

61. The Trustees proceeded with a natural resource damage assessment and published their *Final Primary Restoration Plan and Environmental Assessment for the 2006 T/V Margara Grounding, Guayanilla, Puerto Rico* ("Primary Restoration Plan") in April 2015.

62. The Trustees determined that salvage of the *T/V Margara* and the efforts involved in safely refloating the vessel damaged more than 6,700 square meters of reef.

63. The Trustees determined that the incident affected more than 165,000 corals.

64. The Trustees' Primary Restoration Plan selected a restoration project design that would address 1,662 square meters of reef that the *T/V Margara* grounding had reduced to rubble by first creating and installing limestone modules at the site to restore topographic complexity and stabilize rubble areas, and then by transplanting corals onto the restoration structures.

65. As the Trustees noted in their Primary Restoration Plan, the Plan aimed to "ensure the affected area is restored through the recovery of resources and services at the site." However, the Primary Restoration Plan was only the first phase of a complete accounting for natural resource damages resulting from the *T/V Margara* incident. As the Trustees explained, "[t]he additional restoration needed to compensate for the interim losses to the coral reef ecosystem will be proposed in a future compensatory restoration plan."

66. On or about July 6, 2016, the Trustees presented the claim for primary restoration costs to IMC and Norwegian Hull Club, but did not receive a reply.

11

67. On or about April 14, 2017, the Trustees presented the claim for primary restoration costs to Pierson and Burnett, LLP, the authorized agent listed on the Certificate of Financial Responsibility, but the package was returned as undeliverable.

68. On or about April 14, 2017, the Trustees presented the claim for primary restoration costs to SIGCo, the guarantor listed on the *T/V Margara*'s Certificate of Financial Responsibility.

69. On or about July 5, 2017, the Trustees received correspondence from the law firm Moseley Prichard Parrish Knight & Jones, as representatives of SIGCo, declining to pay the Trustees' claim for primary restoration costs.

### D. Subrogation of Claim to NPFC for Primary Restoration Costs

70. With their demands for primary response costs leveled (per 15 C.F.R. § 990.62) and unsatisfied (per *id*. § 990.62), NOAA, on behalf of the Trustees, presented a claim to the Coast Guard's NPFC on or about September 28, 2017, to recover primary restoration costs associated with natural resource damages caused by the recovery of *T/V Margara*.

71. After processing the Trustees' claim, and after reviewing the application and evidence available to it, the NPFC concurred with the FOSC that the *T/V Margara* posed a substantial threat of an oil discharge into navigable waters.

72. Furthermore, after evaluating the Trustees' Primary Restoration Plan and considering comments provided by SIGCo regarding the Plan, the NPFC concluded that "(1) the creation of limestone reef will restore the rubble areas and (2) the transplanting of adult corals will restore the natural resources and services to baseline on an accelerated time frame. Therefore the claimed primary restoration project [was] reasonable and appropriate under OPA."

73. On or about February 9, 2019, NPFC published its initial claim determination regarding the Trustees' claim for primary restoration costs.

74. After reconsideration, the NPFC issued a Final Reconsidered Claim Determination on or about May 30, 2019, awarding $4,403,590.98 in compensation for primary restoration efforts and authorizing $794,183.46 in contingency funds.

75. The Trustees accepted the NPFC's resolution of their claim for primary restoration costs on or about July 19, 2019, and the NPFC made payment on that claim on or about August 12, 2019.

76. On or about March 30, 2021, NOAA, on behalf of the Trustees, requested the previously authorized contingency funds. NPCA made payment of those funds on or about May 14, 2021.

77. The NPFC incurred $54,776.50 in costs associated with the NOAA's claim for primary restoration costs and dispersal of contingency funding, including interest (including prejudgment interest), administrative and adjudicative costs, and attorney's fees.

### E.    Additional Uncompensated Natural Resource Damages

78. The Trustees continue to assess the scope of damages resulting from the *T/V Margara* incident and to develop a final restoration plan, including for compensatory restoration.

79. In October of 2020, the Trustees published a draft restoration plan for other uncompensated damages related to the *T/V Margara* incident titled *Draft Phase II of the Comprehensive Plan for the 2006 T/V Margara Incident Natural Resource Damage Assessment: Compensatory Restoration Plan and Environmental Assessment* ("Draft Compensatory Restoration Plan").

80. In their Draft Compensatory Restoration Plan, the Trustees calculated, as preliminary assessment, that more than 550,000 coral colony years—a measure not only of coral structures but also representing biological services provided by the associated fish and other biota—have been lost to date as a result of the *T/V Margara* incident.

81. In their Draft Compensatory Restoration Plan, the Trustees proposed to compensate the public for these interim losses to coral reef resources by implementing asexual coral propagation to directly replace lost coral resources and restore degraded and impacted coral reefs. Initial estimates of the necessary restoration work suggested compensatory restoration efforts would cost $35–40 million.

**FIRST CLAIM FOR RELIEF**
*Subrogated Claim for Primary Restoration Costs
to Reimburse the Oil Spill Pollution Liability Fund*

82. The preceding paragraphs are realleged and incorporated herein by reference.

83. The *T/V Margara* is a "vessel" and a "tank vessel" as those terms are defined by Sections 1001(37) and (34) of OPA, 33 U.S.C. § 2701(37) and (34).

84. The grounding and subsequent salvage of the *T/V Margara* posed a substantial threat of discharge of oil into or upon navigable waters or adjoining shorelines, within the meaning of Section 1002(b)(2) of OPA, 33 U.S.C. § 2702(b)(2).

85. The grounding and subsequent salvage of the *T/V Margara* constituted an "incident" as that term is defined by OPA § 1001(14), 33 U.S.C. § 2701(14).

86. "Natural resources," as that term is defined in Section 1001(2) of OPA, 33 U.S.C. § 2701(20), were injured by been injured, destroyed or lost as the result of that incident.

87. Defendant ErnstJacob is a corporation and a "person" within the meaning of Section 1001(27) of OPA, 33 U.S.C. § 2701(27).

88. Defendant ErnstJacob is a "responsible party" with respect to the *T/V Margara* incident within the meaning of Section 1001(32)(a) of OPA, 33 U.S.C. § 2701(32)(A), and is liable to the United States for removal costs and damages resulting from that incident under Section 1002 of OPA, 33 U.S.C. § 2702.

89. Defendant SIGCo is a corporation and a "person" within the meaning of Section 1001(27) of OPA, 33 U.S.C. § 2701(27).

90. Defendant SIGCo is a "guarantor" with respect to the *T/V Margara* incident within the meaning of Section 1001(13) of OPA, 33 U.S.C. § 2701(13).

91. Under Section 1016(f) of OPA, 33 U.S.C. § 2716(f), Defendant SIGCo is liable to the United States for all removal costs and damages resulting from the *T/V Margara* incident for which the responsible party, Defendant ErnstJacob, is liable under Section 1002 of OPA.

92. Defendants are jointly and severally liable for natural resource damages suffered as a result of the *T/V Margara* grounding incident.

93. The Fund has paid Trustees $5,197,774.44 to perform primary restoration of natural resources damaged as a result of the *T/V Margara* incident.

94. Pursuant to Section 1015 of OPA, 33 U.S.C. § 2715, the United States, on behalf of the NPFC and the Oil Spill Liability Trust Fund, is subrogated to NOAA's claim for the portion of natural resource damages resulting from the *T/V Margara* incident paid by the Fund.

95. As such, Defendants are liable for damages paid from the Fund as a result the *T/V Margara* incident, as well as $54,776.50 in "costs incurred by the Fund by reason of

the claim, including interest (including prejudgment interest), administrative and adjudicative costs, and attorney's fees." OPA § 1015(c), 33 U.S.C. § 2715(c).

96. This action to recover natural resource damages and associated costs incurred by the Fund for primary restoration pursuant to 33 U.S.C. § 2715(c) is timely here as it is commenced within three years after the date of payment on the claim, which occurred in August 2019, and the date of payment on the contingency claim, which occurred in May 2021. *See* OPA § 1017(f)(4), 33 U.S.C. § 2717(f)(4).

**SECOND CLAIM FOR RELIEF**
*Claim for Declaratory Judgment on Liability*
*for Uncompensated Natural Resource Damages*

97. The preceding paragraphs are realleged and incorporated herein by reference.

98. The *T/V Margara* incident resulted in natural resource damages in addition to those for which the Trustees were compensated by the Fund.

99. NOAA, as a federal trustee, continues to assess damages for injuries to natural resources resulting from the *T/V Margara* incident, including through its preparation and publication for public comment of the Draft Compensatory Restoration Plan.

100. NOAA, as a federal trustee, has incurred and continues to incur costs in assessing damages to natural resources resulting from the *T/V Margara* grounding incident.

101. Pursuant to Section 1002(a) and (b)(2) of OPA, 33 U.S.C. § 2702(a) and (b)(2), Defendants are liable to the United States, on behalf of NOAA, for uncompensated damages for injury to, destruction of, loss of, or loss of use of natural resources, including the reasonable costs of assessing such injury, destruction, loss, or loss of use resulting from the *T/V Margara* incident as alleged herein.

102. Pursuant to Section 1017(f)(2) of OPA, 33 U.S.C. § 2717(f)(2), Plaintiffs are entitled to a declaratory judgment on liability for damages associated with the *T/V Margara* incident that will be binding on any subsequent action or actions to recover further removal costs or damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff United States of America respectfully requests that the Court:

A. Award Plaintiff, on behalf of the Fund, a judgment against Defendants for all compensation paid by the Fund to Trustees for natural resource damages related to the *T/V Margara* incident, and all costs incurred by the Fund by reason of those claims, including interest, administrative and adjudicative costs, and attorney's fees; and

B. Enter a declaratory judgment against Defendants for all additional, uncompensated damages for injury to, destruction of, loss of, or loss of use of natural resources resulting from the *T/V Margara* incident, including the reasonable costs of assessing such injury, destruction, loss, or loss of use; and

C. Award such other and further relief as the Court deems appropriate.

Respectfully submitted,

TODD KIM
Assistant Attorney General
Environment and Natural Resources Division
United States Department of Justice

*s/ Elias L. Quinn*
ELIAS L. QUINN (G03503)
Senior Attorney
NATALIE G. HARRISON (G03504)
Trial Attorney

Environmental Enforcement Section
Environmental and Natural Resources Division
U.S. Department of Justice
P.O. Box 7611, Ben Franklin Station
Washington, DC 20044-7611
(202) 514-2756
Elias.Quinn@usdoj.gov