UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

UNITED STATES OF AMERICA,

     Plaintiff,

     v.

ERNST JACOB and SHIPOWNERS
INSURANCE AND GUARANTY
COMPANY LTD,

     Defendants,

     v.

STEAMSHIP MUTUAL UNDERWRITING
ASSOCIATION LTD and MARGARA
SHIPPING LTD,

     Third-Party Defendants.

Civil Action No. 3:21-cv-1594-SCC-MEL

**MEMORANDUM IN SUPPORT OF PLAINTIFF'S MOTION
FOR PARTIAL SUMMARY JUDGMENT ON DEFENDANTS' LIABILITY**

**Table of Contents**

STATUTORY AND REGULATORY BACKGROUND ................................................................2

   A.   Incident Assessment And Emergency Response ........................................................2

   B.   Liability for Natural Resource Damages ...................................................................4

   C.   The Oil Spill Liability Trust Fund and Recovering Damages ................................5

FACTS: THE T/V *MARGARA* INCIDENT AND RESPONSE .........................................6

   A.   The Grounding of the T/V *Margara* and Response ...............................................6

   B.   Natural Resource Damage Assessment and Procedural History ...................................8

STANDARD OF REVIEW ......................................................................................................10

ARGUMENT ...........................................................................................................................11

   1.   Under OPA, the FOSC Has the Authority to Determine Whether a Substantial Threat of Discharge Exists. That Decision Should Be Upheld Unless Shown to Be Arbitrary or Capricious. .................................................................................................12

   2.   The Contemporaneous Documents Show the FOSC's Substantial Threat Determination Was Not Arbitrary or Capricious. .......................................................15

   3.   As Explained by the FOSC and His Deputy, the Substantial Threat Determination Was Justified and Appropriate. ..........................................................18

   4.   The Coast Guard's Actions Reflect a Real-Time Response to a Substantial Threat of Discharge. ..............................................................................................................21

   5.   The T/V *Margara* Was a Vessel in Navigable Waters of the United States, and the Response to the Incident Caused Damages to Natural Resources. ................................23

CONCLUSION .......................................................................................................................24

# Table of Authorities

## Cases

*Am. Bioscience, Inc. v. Thompson,*
  269 F.3d 1077 (D.C. Cir. 2001) .................................................................. 12
*Assoc. Fisheries of Me., Inc. v. Daley,*
  127 F.3d 104 (1st Cir. 1997) ...................................................................... 10
*Biden v. Missouri,*
  142 S.Ct. 647 (2022) ........................................................................... 13, 18
*Bos. Redevelopment Authority v. Nat'l Park Serv.,*
  838 F.3d 42 (1st Cir. 2016) ........................................................................ 10
*Cape Flattery Ltd. v. Titan Maritime LLC,*
  607 F. Supp. 2d 1179 (D. Haw. 2009) ....................................................... 18
*Carmona v. Toledo,*
  215 F.3d 124 (1st Cir. 2000) ...................................................................... 10
*Catanzaro v. Weiden,*
  188 F.3d 56 (2d Cir. 1999) ........................................................... 13, 15, 16
*Celotex Corp. v. Catrett,*
  477 U.S. 317 (1986) .................................................................................. 10
*City of Colo. Springs v. Solis,*
  589 F.3d 1121 (10th Cir. 2009) ................................................................. 17
*City of Taunton v. EPA,*
  895 F.3d 120 (1st Cir. 2018) ..................................................... 12, 15, 16, 18
*Clifford v. Peña,*
  77 F.3d 1414 (D.C. Cir. 1996) .................................................................. 18
*Puerto Rico v. SS Zoe Colocotroni,*
  456 F. Supp. 1327 (D.P.R. 1978) .............................................................. 14
*EEOC v. Steamship Clerks Union, Local 1066,*
  48 F.3d 594 (1st Cir. 1995) ....................................................................... 10
*FCC v. Fox Television Stations, Inc.,*
  556 U.S. 502 (2009) .................................................................................. 16
*FERC v. Elec. Power Supply Ass'n,*
  577 U.S. 260 (2016) .................................................................................. 12
*Fla. Power & Light Co. v. Lorion,*
  470 U.S. 729 (1985) .................................................................................. 16
*Gatlin Oil Co. v. United States,*
  169 F.3d 207 (4th Cir. 1999) ..................................................................... 24
*In re Oil Spill by Oil Rig Deepwater Horizon in Gulf of Mexico,*
  MDL No. 2179, 2012 WL 5960192 (E.D. La. Nov. 28, 2012) ......................... passim
*In re Complaint of Metlife Cap. Corp.,*
  132 F.3d 818 (1st Cir. 1997) ....................................................................... 4
*In re S. Scrap Material Co.,*
  713 F. Supp. 2d 568 (E.D. La. 2010) ......................................................... 14

*In re Settoon Towing LLC,*
  722 F. Supp. 2d 706 (E.D. La. 2009) ............................................................ 14, 21
*Ironshore Specialty Ins. Co. v. United States,*
  871 F.3d 131 (1st Cir. 2017) .......................................................................... 2
*Asociacion Hospital del Maestro, Inc. v. Azar,*
  Civ. No. 17-2302 (ADC), 2019 WL 1459918 (D.P.R. Mar. 29, 2019) ............ 10, 12
*Menkes v. Dep't of Homeland Sec.,*
  486 F.3d 1307 (D.C. Cir. 2007) ..................................................................... 17
*Olivares v. Transp. Sec. Admin.,*
  819 F.3d 454 (D.C. Cir. 2016) ....................................................................... 18
*Olsen v. United States,*
  414 F.3d 144 (1st Cir. 2005) .......................................................................... 15
*Pepperell Assocs. v. EPA,*
  246 F.3d 15 (1st Cir. 2011) ............................................................................ 12
*S. Commons Condo. Ass'n v. Charlie Arment Trucking, Inc.,*
  775 F.3d 82 (1st Cir. 2014) ............................................................................ 13
*Sierra Club v. Marsh,*
  976 F.2d 763 (1st Cir. 1992) .......................................................................... 18
*Sig Sauer, Inc. v. Jones,*
  133 F. Supp. 3d 364 (D.N.H. 2015) ............................................................... 10
*Starr Indem. & Liability Co. v. Water Quality Ins. Syndicate,*
  320 F. Supp. 3d 549 (S.D.N.Y. 2018) ............................................................ 21
*United States v. Bros. Enters., Inc.,*
  113 F. Supp. 3d 907 (E.D. Tex. 2015) ........................................................... 14, 21
*United States v. Conoco, Inc.,*
  916 F. Supp. 581 (E.D. La. 1996) .................................................................. 5
*United States v. English,*
  No. CV00–00016ACKBMK, 2001 WL 940946 (D. Haw. Mar. 28, 2001) ....... 16, 23
*United States v. HVI Cat Canyon, Inc.,*
  314 F. Supp. 3d 1049 (C.D. Cal. 2018) .......................................................... passim
*United States v. Hyundai Merch. Marine Co.,*
  172 F.3d 1187 (9th Cir. 1999) ........................................................................ passim
*United States v. Hyundai Merch. Marine Co.,*
  No. A94-0391-CV, 1996 WL 254377 (D. Alaska, Jan. 26, 1996) .................... 15
*United States v. JG-24, Inc.,*
  478 F.3d 28 (1st Cir. 2007) ............................................................................ 14
*United States v. Kilroy & Assoc.,*
  No. C08-1019-JCC, 2009 WL 3633891 (W.D. Wash. Oct. 30, 2009) ............ 16, 23
*Upper Blackstone Water Pollution Abatement Dist. v. EPA,*
  690 F.3d 9 (1st Cir. 2012) .............................................................................. 16
*Walter O. Boswell Mem'l Hosp. v. Heckler,*
  749 F.2d 788 (D.C. Cir. 1984) ....................................................................... 15

## Statutes

5 U.S.C. § 551 ............................................................................................................. 10
5 U.S.C. § 706 ......................................................................................................... 12, 15
26 U.S.C. § 9509 ................................................................................................. 3, 13, 22
33 U.S.C. § 1321 ................................................................................................... passim
33 U.S.C. § 2701 ................................................................................................. 4, 22, 24
33 U.S.C. § 2702 ................................................................................................... 1, 4, 11
33 U.S.C. § 2705 .......................................................................................................... 5
33 U.S.C. § 2706 .......................................................................................................... 5
33 U.S.C. § 2712 ................................................................................................... passim
33 U.S.C. § 2713 .......................................................................................................... 5
33 U.S.C. § 2715 ....................................................................................................... 5, 6
33 U.S.C. § 2716 .......................................................................................................... 4
33 U.S.C. § 2717 .......................................................................................................... 5
33 U.S.C. § 2752 ......................................................................................................... 13

## Rules

Fed. R. Civ. P. 56(a) ................................................................................................... 10

## Regulations

15 C.F.R. § 990.30 ........................................................................................................ 5
15 C.F.R. § 990.62 ........................................................................................................ 5
15 C.F.R. § 990.64 ........................................................................................................ 5
33 C.F.R. § 155.1020 ................................................................................................ 3, 18
33 C.F.R. § 136.1 .......................................................................................................... 3
33 C.F.R. § 136.207 ...................................................................................................... 3
40 C.F.R. § 300.130 ............................................................................................... 2, 4, 13
40 C.F.R. § 300.2 .......................................................................................................... 2
40 C.F.R. § 300.600 ...................................................................................................... 5
40 C.F.R. § 300.120 ...................................................................................................... 2

## Other Authorities

H.R. Rep. No. 101-242, 1989 ....................................................................................... 3
S. Rep. No. 101-94, 1990 ........................................................................................ 2, 23

## ACRONYMS

APA – Administrative Procedure Act

FOSC – Federal On-Scene Coordinator

NCP – National Contingency Plan

NOAA – National Oceanic and Atmospheric Administration

NPFC – National Pollution Fund Center

OPA – Oil Pollution Act

T/V – Tanker Vessel

Shortly after midnight on April 27, 2006, the 748-foot oil tanker T/V *Margara* ran aground into dense coral reefs a few miles off the southern coast of Puerto Rico, near Tallaboa. Early efforts by the crew to dislodge the tanker were unsuccessful, leaving the T/V *Margara*—and its cargo of more than 300,000 barrels of No. 6 fuel oil—wallowing on a coral reef, in a remote part of Puerto Rico, and within sight of sensitive mangrove forests. The United States Coast Guard determined that the T/V *Margara* presented a substantial threat of discharge of oil under the Oil Pollution Act and responded accordingly. The Coast Guard set up a unified command center and oversaw response efforts. Coordinating tug-assists with the rising tide, the T/V *Margara* was briefly floated, but grounded again almost immediately just to the north of the first impact site. Response authorities continued to work to maneuver the vessel off the reef. After nearly 24 hours, the T/V *Margara* was successfully refloated without any oil being spilled into the marine environment.

Though the Coast Guard successfully prevented the T/V *Margara* from becoming a household name like the *Exxon Valdez*, the incident has nevertheless had a lasting impact on the area's natural resources. Thousands of corals were lost during the response effort, and huge swaths of the reef were reduced to rubble during attempts to free the vessel, leaving behind desolate seascapes that will take decades to recover—and may never recover without support. The National Oceanic and Atmospheric Administration's detailed analyses reveal the incident caused more than $36 million dollars in natural resource damages.

Under the Oil Pollution Act, each owner, operator, and guarantor for a vessel that poses a substantial threat of discharge of oil into navigable waters is liable for the incident's damages to natural resources. 33 U.S.C. § 2702(a), (b)(2)(A). In this Motion for Partial[1] Summary Judgment, the United States respectfully requests that the Court find: 1) the Coast Guard's determination that the

---

[1] The United States' Motion for Partial Summary Judgment does not seek a determination on the scope of natural resources damages.

T/V *Margara* posed a substantial threat of discharge of oil was not arbitrary or capricious; and 2) the Responsible Party and Guarantor are liable for natural resource damages caused by the response under Section 1002 of the Oil Pollution Act.

## STATUTORY AND REGULATORY BACKGROUND

In the wake of the 1989 *Exxon Valdez* disaster, Congress passed the Oil Pollution Act (OPA) to help prevent or mitigate such oil spills in the future, as well as to streamline and fund cleanup and recovery efforts for such incidents. *See Ironshore Specialty Ins. Co. v. United States*, 871 F.3d 131, 136 (1st Cir. 2017); S. Rep. No. 101-94, at 2–4 (1990), as reprinted in 1990 U.S.C.C.A.N. 722, 723. To accomplish these goals, OPA directed federal authorities to oversee response and recovery efforts; imposed strict liability on vessel owners, operators, and guarantors for damages to natural resources; and implemented a structure to fund response and restoration efforts.

### A.      Incident Assessment And Emergency Response

To ensure a swift and unified response to discharges of oil or substantial threats of such discharges, OPA delegates response and oversight efforts to federal authorities. *In re Oil Spill by Oil Rig Deepwater Horizon in Gulf of Mexico*, MDL No. 2179, 2012 WL 5960192, at *7 (E.D. La. Nov. 28, 2012) (citing 33 U.S.C. § 1321(c)(3)). Congress directed that executive officers proceed under the National Contingency Plan (NCP) to "ensure effective and immediate removal of a discharge, and mitigation or prevention of a substantial threat of a discharge of oil." 33 U.S.C. § 1321(c)(1)(A)(i); *see also* 40 C.F.R. § 300.2 (incorporating the NCP into OPA response actions). Under the NCP, the Coast Guard designates Federal On-Scene Coordinators (FOSCs) to direct response efforts and coordinate all other efforts for oil discharges within or threatening the coastal zone. 40 C.F.R. §§ 300.120(a)(1), 300.130(b). The Oil Spill Liability Trust Fund (the Fund), created by OPA and administered by the Coast Guard's National Pollution Fund Center, provides immediate funding to the FOSC and others for things like removal costs that are consistent with the NCP, as well as for

damages that are cognizable under OPA, like natural resource damages. 33 U.S.C. § 2712(a)(4); 26

U.S.C. § 9509(c)(1)(A) (allowing Fund expenditures for payment of removal costs and damages); 33

C.F.R. §§ 136.1, 136.207–211 (authorizing claims against the Fund for natural resource damages

resulting from the discharge or substantial threat of discharge of oil).

To be sure, not all tanker vessels carrying oil necessarily present a "substantial threat" of

discharge. As the House Committee on Merchant Marine and Fisheries explained in its report,

Congress:

> intend[ed] that liability for removal costs resulting from a threat of a discharge of oil
> should attach in the event that the threat is substantial. Thus[,] liability may exist if a
> vessel were aground and actions were taken to prevent the vessel from breaking up
> and spilling oil. No liability would result, however, from the presence of tanker traffic
> alongside waterfront property resulting in reduced property values because of the
> potential for a discharge of oil.

H.R. Rep. No. 101-242, pt. 2, 101st Con., 1st Sess. 56 (1989). Accordingly, the Coast Guard's Vessel

Response Plan regulations define "substantial threat of such a discharge" as "any incident involving

a vessel that may create a significant risk of discharge of cargo oil," including groundings. 33 C.F.R.

§ 155.1020. Coast Guard Operating Procedures direct FOSCs to perform a case-by-case, fact-

intensive inquiry when determining if a substantial threat of discharge exists. NPFC Instruction

M.7300.1, Technical Operating Procedures for Determining Removal Costs Under the Oil Pollution

Act of 1990, Nance Decl. ¶ 5, Ex. 1.s at 3-76 (hereinafter "OPA Operating Procedures"). As

described by the manual, factors an FOSC should consider when determining whether to respond to

a substantial threat of discharge include whether the "situation presents an unacceptable probability

that a discharge will occur without FOSC intervention," the potential for damage to environmentally

sensitive or populous areas, and whether "action must be taken quickly to prevent a spill." *Id.* The

Coast Guard is then "authorized to initiate . . . appropriate response activities when [the FOSC]

determinates that . . . there is a substantial threat of discharge of [oil] from any vessel . . . into or on

the navigable waters of the United States . . . or that may affect natural resources belonging to . . . the United States." 40 C.F.R. § 300.130(b).

### B. Liability for Natural Resource Damages

OPA imposes strict liability on "responsible parties"—including an oil tanker's owner or operator (33 U.S.C. § 2701(32)(A))—for damages and costs associated with an incident. 33 U.S.C. § 2702(a). Specifically, Section 1002 of the statute proclaims:

> each responsible party for a vessel . . . from which oil is discharged, or which poses the substantial threat of a discharge of oil, into or upon the navigable waters or adjoining shorelines or the exclusive economic zone is liable for the removal costs and damages . . . that result from such incident.[2]

*Id.*; *see also Complaint of Metlife Cap. Corp.*, 132 F.3d 818, 820–21 (1st Cir. 1997) (discussing OPA's strict liability standard). To ensure the environment and the public can be made whole after such an incident, OPA also requires responsible parties to demonstrate financial responsibility equal to the statutory limits on liability and allows injured parties to recover removal costs and damages from guarantors. 33 U.S.C. § 2716(a), (f).

OPA's strict liability standard extends to claims for "natural resource" damages that result from an incident, that is, damages to "land, fish, wildlife, biota, air, water, ground water, drinking water supplies, and other such resources belonging to, managed by, held in trust by, appertaining to, or otherwise controlled by the United States" or other relevant sovereigns. *Id.* at §§ 2701(20), 2702(b)(2)(A). Compensable natural resource damages include: (1) the "primary restoration" costs of returning injured natural resources and services to the baseline condition that would have existed had the incident not occurred; (2) the "compensatory restoration" costs, which account for interim losses of natural resources and services that occur from the date of the incident until recovery; and

---

[2] "Incident" is defined as "any occurrence or series of occurrences having the same origin, involving one or more vessels, facilities, or any combination thereof, resulting in the discharge or substantial threat of discharge of oil." 33 U.S.C. § 2701(14).

(3) reasonable assessment costs. *Id.* § 2706(d)(1); 15 C.F.R. § 990.30 (defining primary and compensatory restoration). Responsible parties and guarantors are also liable for interest on claims that accrues after the claim has been presented to them. 33 U.S.C. § 2705.

The United States National Oceanic and Atmospheric Administration (NOAA) serves as trustee for natural resources at issue in this case. *See id.* at § 2706(b); 40 C.F.R. § 300.600(b)(1). OPA directs NOAA to "assess natural resource damages" and "develop and implement a plan for the restoration . . . of natural resources under their trusteeship" in accordance with applicable regulations developed under OPA. 33 U.S.C. § 2706(c)(1), (e)(1).

### C.    The Oil Spill Liability Trust Fund and Recovering Damages

Once a natural resource trustee has determined that an incident resulted in natural resource damages, and after a responsible party or guarantor has declined the trustee's demand for damages,[3] the trustee can recover the costs necessary to assess damages and implement restoration projects in one of two primary ways. First, it can pursue claims for uncompensated damages in court, seeking to recover from the responsible parties or guarantors directly. 33 U.S.C. § 2713(c). This recovery can happen in stages: when a disaster is ongoing or the damage assessment is still underway, OPA allows trustees to pursue interim claims for damages and seek a declaratory judgement on liability for assessments yet to be completed. *Id.* §§ 2715(b); 2717(f)(2). Second, a trustee can submit its claim (including interim claims) to the National Pollution Funds Center (NPFC) within the Coast Guard for recovery from the Fund. *Id.* at § 2712(a)(4); 15 C.F.R. § 990.64. The NPFC administers the Fund to provide for "expeditious pollution response efforts and uncompensated damages." *United States v. Conoco, Inc.*, 916 F. Supp. 581, 583 (E.D. La. 1996). When a trustee recovers from the Fund, OPA

---

[3]    *Id.* at § 2713(a); 15 C.F.R. § 990.62.

subrogates the trustee's claim to the NPFC, which may pursue unreimbursed claims in federal court. 33 U.S.C. §§ 2712(f), 2715(a), (c).

## FACTS: THE T/V *MARGARA* INCIDENT AND RESPONSE

### A. The Grounding of the T/V *Margara* and Response

Late on the night of April 26, 2006, the T/V *Margara*, a 748-foot oil tanker, entered Bahia de Tallaboa, along the southern coast of Puerto Rico. Plaintiff's Statement of Material Facts (SOF) ¶¶ 1, 10, 15–16. The double-hulled vessel was carrying approximately 309,000 barrels of No. 6 fuel oil, bound for the CORCO facility in Guayanilla. SOF ¶¶ 10–11, 14. The T/V *Margara*'s master passed the Guayanilla Pilot Station, heading north towards the shallow waters at the entrance of Bahia de Tallaboa, rather than following the vessel's voyage plan towards Guayanilla. SOF ¶ 15. About three miles off the coast, outside the proper navigational channel and without a local pilot aboard, the T/V *Margara* ran aground in an area of dense coral reefs at approximately 12:30 am on April 27. SOF ¶¶ 16–18, 21.

After the crew tried and failed to free the T/V *Margara*, the Coast Guard was notified of the grounding. SOF ¶¶ 19, 23. The Coast Guard's Sector San Juan scrambled a response team and established a command post on shore to monitor the situation and coordinate response planning with natural resource trustees and vessel representatives. SOF ¶¶ 23, 36, 48–73.

Coast Guard personnel reported that the T/V *Margara* was hard aground, lifted, and listing, suggesting that the vessel's hull was strained and the vessel may have been unstable. SOF ¶¶ 30–34. Regular soundings of the cargo holds revealed the T/V *Margara* had not lost any of its freight oil, but it had grounded in an environmentally sensitive area of mature coral reefs and mangroves— resources that would have almost certainly been devastated by a spill of No. 6 fuel oil. SOF ¶¶ 12– 13, 36–40, 47. From this, the Coast Guard's FOSC concluded the grounding posed "a substantial threat of discharge of oil" into the surrounding waters, issued a Notice of Federal Interest to a

representative of the Responsible Party (RP), established the Unified Command, and began overseeing response efforts. SOF ¶¶ 23–44, 48–73.

The Coast Guard team readied protective booms around the T/V *Margara* to contain any oil, identified environmentally sensitive areas to deploy additional booms in the event of a discharge, and brought in tug boats to aid the rescue effort. Ernst Jacob Answer, ECF No. 42, ¶ 49; SOF ¶¶ 53, 62–66. The Coast Guard-led response team rotated the vessel and maneuvered it with tugs in concert with the rising tide (locations 1 and 2 on the diagram below). SOF ¶¶ 53–54, 62, 68. This effort was briefly successful in refloating the vessel (location 3), but it soon ran aground again (location 4), where it was again maneuvered with the assistance of tugs before being freed, for good this time. SOF ¶¶ 69–72.



*Left:* T/V Margara *grounding site off Tallaboa Bay | Right: Reconstruction of vessel movement during response*

Shortly after midnight on April 28, 2006, the T/V *Margara* was freed and moved into deeper water, before entering the protected Guayanilla Bay for a dive survey of the hull. SOF ¶ 73. The

underwater hull survey revealed only cosmetic damage. SOF ¶ 74. No oil was ultimately discharged during the grounding or response actions. SOF ¶ 75.

NOAA employees, accompanied by representatives of the RP, later conducted several reconnaissance dives at the site. SOF ¶¶ 78–88. Corals damaged by prop-wash, rubble berms indicative of the hull twisting on the reef, and corals "flattened like a parking lot" at the Northern Impact Area confirmed that response efforts during the T/V *Margara* incident had damaged natural resources. SOF ¶¶ 83–89.

### B.     Natural Resource Damage Assessment and Procedural History

For approximately two years, the natural resource trustees at NOAA and the Puerto Rico Department of Natural and Environmental Resources coordinated with the RP to perform emergency restoration of corals injured by the grounding and response. SOF ¶ 90. In October 2009, the RP paid approximately $433,000 to the federal and commonwealth trustees for emergency restoration and some of their past assessment costs. SOF ¶ 91. Following emergency restoration efforts, the trustees turned their attention to primary restoration[4] of the damaged reef. However, in May 2014, a representative from the Norwegian Hull Club, the RP's insurer, informed the trustees that Margara Shipping Ltd., the owner of the T/V *Margara*, was undergoing foreign insolvency proceedings, which ultimately limited the RP's further participation in restoration discussions.[5]

In May 2015, the trustees issued a Final Primary Restoration Plan and Environmental Assessment for the 2006 T/V *Margara* Grounding. SOF ¶ 93. NOAA presented an interim

---

[4]     The trustees decided to phase primary and compensatory restoration planning because the primary restoration plan would determine the date of recovery of injured natural resources and services and, therefore, the scope of compensatory restoration necessary to restore interim losses. SOF ¶ 92.

[5]     On December 6, 2021, the Grand Court of the Cayman Islands Financial Services Division ordered that Margara Shipping Ltd. be restored to the Register of Companies of the Cayman Islands and placed it into official liquidation.

claim/demand to Ernst Jacob, the RP, in July 2016, and to SIGCo, the Guarantor, in April 2017, for approximately $5.9 million to implement the primary restoration outlined in the 2015 Final Primary Restoration Plan. SOF ¶¶ 94–97. After neither the RP nor the Guarantor satisfied the demand, NOAA submitted a revised[6] interim claim for primary restoration to the NPFC in a letter dated September 2017. SOF ¶¶ 95–99.

After receiving NOAA's revised interim claim for primary restoration, NPFC contacted the Guarantor, informing it that NPFC intended to adjudicate NOAA's claim and inviting it to present comments and correspondence regarding the Trustees' Primary Restoration Plan. SOF ¶ 100. The Guarantor provided at least 175 pages of argument and documents in response, arguing for a denial of NOAA's claim for primary restoration damages, primarily on the grounds that, according to the Guarantor, no substantial threat of discharge ever existed. SOF ¶ 101. On February 8, 2019, NPFC issued a determination rejecting the Guarantor's arguments and awarding NOAA approximately $4.4 million in primary restoration, with approximately $794,000 in contingency funding, which were paid in August 2019 and May 2021, respectively. SOF ¶¶ 102, 106–07. On December 9, 2021, the United States filed a complaint on behalf of NPFC for its subrogated claim, and NOAA submitted a demand to the RP and Guarantor for approximately $31 million for NOAA's and Puerto Rico's outstanding assessment costs, outstanding emergency restoration costs, and costs for implementing and overseeing compensatory restoration. SOF ¶ 108. On March 25, 2022, the United States amended its complaint to incorporate NOAA's final claim for natural resource damages and NOAA's outstanding assessment costs. Amended Complaint, ECF No. 9.

---

[6]     NOAA initially submitted its interim claim for primary restoration to the NPFC in December 2016, following an unsatisfied demand to the RP. NOAA submitted its revised claim in September 2017 after submitting a demand to the Guarantor. SOF ¶¶ 96–99.

## STANDARD OF REVIEW

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Carmona v. Toledo*, 215 F.3d 124, 132 (1st Cir. 2000). The moving party may identify individual claims or parts of a claim for which it seeks summary judgment, so a court may award summary judgment on the question of liability alone, even if remedy issues remain. *See, e.g.*, *EEOC v. Steamship Clerks Union, Local 1066*, 48 F.3d 594, 610 (1st Cir. 1995) (affirming grant of partial summary judgment on liability).

At the summary judgment stage, evidence is generally viewed in the light most favorable to the non-moving party. However, where a decision has been delegated to an agency by Congress, an agency's decisionmaking is generally governed by the Administrative Procedure Act, 5 U.S.C. § 551 *et seq.* At such times, "the usual rules that describe how the Court must construe the summary judgment record do not apply." *Asociacion Hospital del Maestro, Inc. v. Azar*, Civ. No. 17-2302 (ADC), 2019 WL 1459918, at * 3 (D.P.R. Mar. 29, 2019) (citations omitted). Instead:

> In the [administrative law] context, a motion for summary judgment is simply a vehicle to tee up a case for judicial review, and thus, an inquiring court must review an agency action not to determine whether a dispute of fact remains, but rather, to determine whether the agency action was arbitrary and capricious.

*Bos. Redevelopment Authority v. Nat'l Park Serv.*, 838 F.3d 42, 47 (1st Cir. 2016) (citations omitted). Thus, where Congress has committed a decision to an agency's expertise, the agency's factual conclusions warrant deference, regardless of which party seeks summary judgment. *See Sig Sauer, Inc. v. Jones*, 133 F. Supp. 3d 364, 369 (D.N.H. 2015), *aff'd sub nom. Sig Sauer, Inc. v. Brandon*, 826 F.3d 598 (1st Cir. 2016). "Because the APA standard affords great deference to agency decisionmaking and because the [agency's] action is presumed valid, judicial review, even at the summary judgment stage, is narrow." *Assoc. Fisheries of Me., Inc. v. Daley*, 127 F.3d 104, 109 (1st Cir. 1997).

**ARGUMENT**

Defendants are jointly and strictly liable for costs and damages associated with the T/V

*Margara* incident under OPA if they (1) are "responsible part[ies]" or "guarantors" (2) for a "vessel"

(3) "which pose[d] a substantial threat of a discharge of oil" (4) "into or upon the navigable waters

or adjoining shorelines or the exclusive economic zone," and (5) which resulted in compensable

removal costs or natural resource damages. *See* 33 U.S.C. § 2702(a). Elements 1, 2, 4, and 5 are

undisputed; the T/V *Margara* was a "vessel" operated by ErnstJacob, guaranteed by SIGCo, and

grounded in navigable coastal waters. Ernst Jacob Answer ¶¶ 1 (admitting that the T/V *Margara* was

a 748-foot tanker), 31–34 (admitting Ernst Jacob was the operator and SIGCo was the guarantor),

55 (acknowledging that some natural resources were damaged); SIGCo Answer, ECF No. 39, ¶¶ 32–

34 (admitting that SIGCo was listed as the guarantor). The effort to free the vessel and abate the

threat of discharge damaged extensive areas of the surrounding reef—not only around the original

grounding site, but at a second impact zone to the north of the first. SOF ¶¶ 68–72, 81–87, 89.

The facts central to the third element—the "substantial threat of discharge"—are both

straightforward and beyond genuine dispute.[7] The T/V *Margara* was loaded with more than 300,000

barrels of No. 6 fuel oil and grounded in an environmentally sensitive area. SOF ¶¶ 11, 21, 36–40.

Early reports suggested the T/V *Margara* was lifted and listing, suggesting the vessel was under

strain, unstable, or both. SOF ¶¶ 30–34. The Coast Guard's FOSC determined the T/V *Margara*

posed a substantial threat of discharge, and took the steps he deemed necessary to prevent a spill.

SOF ¶¶ 41–73. As Congress committed the substantial threat determination to the Executive, who

---

[7]    Additionally, the facts of the grounding have been known to and uncontested by the RP and Guarantor for years: the RP participated in the response events that began that day and continued to participate in emergency restoration. SOF ¶¶ 58, 64, 79–80, 90–91. The Guarantor also obtained documents pertaining to the "full investigation file" for the T/V *Margara* Incident via Freedom of Information Requests directed to NPFC and NOAA in 2017. SOF ¶¶ 109–10. The Trustees also have made their administrative record available online at https://www.diver.orr.noaa.gov/web/guest/diver-admin-record/6204.

in turn delegated to the FOSC, the sole liability question for this Court is whether the FOSC's substantial threat determination was justified—a legal question for which summary judgment is appropriate. *See Am. Bioscience, Inc. v. Thompson*, 269 F.3d 1077, 1083 (D.C. Cir. 2001); *Asociacion Hospital del Maestro*, 2019 WL 1459918 at *3. The uncontested facts and contemporaneous records make it plain that the grounding of the T/V *Margara* "contained the seeds of a major ecological disaster." *United States v. Hyundai Merch. Marine Co.*, 172 F.3d 1187, 1191 (9th Cir. 1999). Under the circumstances, the FOSC's determination cannot be called arbitrary or capricious; the determination was reasonable and prudent—and should not now be disturbed.

1.    **Under OPA, the FOSC Has the Authority to Determine Whether a Substantial Threat of Discharge Exists. That Decision Should Be Upheld Unless Shown to Be Arbitrary or Capricious.**

Where Congress delegates administrative decisions to agency actors, judicial review of those decisions should proceed under the Administrative Procedure Act. 5 U.S.C. § 706(2)(A); *City of Taunton v. EPA*, 895 F.3d 120, 126 (1st Cir. 2018). Under the APA, courts defer to administrative determinations, disturbing them only if shown to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 5 U.S.C. § 706(2)(A); *City of Taunton*, 895 F.3d at 126. In reviewing such decisions, a court should not substitute its later judgement for that of the agency; the "scope of review under the 'arbitrary and capricious' standard is narrow." *FERC v. Elec. Power Supply Ass'n*, 577 U.S. 260, 292 (2016).

The case for deference to an agency's decision "is particularly strong where the agency's expertise comes into play." *Pepperell Assocs. v. EPA*, 246 F.3d 15, 22 (1st Cir. 2011). And such deference is all the more appropriate when the snap decisions of emergency response officials are challenged later. Courts are generally reluctant to overturn administrative decisions made in the face of emergencies for worry that close scrutiny may chill future response efforts:

> The law should not discourage officials from taking prompt action to insure the public safety. By subjecting a decision to invoke an emergency procedure to an exacting

hindsight analysis, where every mistake, even if made in good faith, becomes a constitutional violation, we encourage delay and thereby potentially increase the public's exposure to dangerous conditions. This quandary is exactly what these emergency procedures are designed to prevent . . . .

*Catanzaro v. Weiden*, 188 F.3d 56, 62–63 (2d Cir. 1999); *accord S. Commons Condo. Ass'n v. Charlie Arment Trucking, Inc.*, 775 F.3d 82, 86–87, 92 (1st Cir. 2014) (noting that "summary administrative action may be justified in emergency situations" and that precedent "reflect[s] the reality" that emergency response officials "must make difficult choices with dispatch in order to protect the public"). Ultimately, "the role of courts in reviewing arbitrary and capricious challenges is to simply ensure that the agency has acted within a zone of reasonableness." *Biden v. Missouri*, 142 S.Ct. 647, 654 (2022) (brackets and quotations omitted).

Through OPA, Congress directed the Executive to address a substantial threat of discharge in accordance with the National Contingency Plan: "The President <u>shall</u>, in accordance with the [NCP] . . . <u>ensure</u> effective and immediate removal of a discharge, and <u>mitigation or prevention of a substantial threat of discharge</u> of oil or a hazardous substance into or on the navigable waters." 33 U.S.C. § 1321(c)(1)(A)(i) (emphasis added); *see also In re Deepwater Horizon*, 2012 WL 5960192, at *13. Under applicable NCP regulations, the FOSC directs response efforts and determines whether a substantial threat of discharge exists. 40 C.F.R. § 300.130(b). When the FOSC determines that a substantial threat of discharge exists, he or she is authorized to initiate appropriate response activities, including accessing the Fund. 33 U.S.C. §§ 1321(c), 2752(b); 26 U.S.C. § 9509(c)(1)(A); 40 C.F.R. § 300.130(b). The substantial threat assessment is necessarily fact-intensive and time-sensitive.[8] FOSCs, as the officials delegated to make this decision, must rely on their experience and

---

[8] For example, the Coast Guard's then-applicable OPA Operating Procedures guided the FOSC to consider, *inter alia*: the "likelihood of a discharge" and whether "the situation presents an unacceptable probability that a discharge will occur without FOSC invention"; the "quantity of oil which may be discharged"; the condition of the vessel and "environmental factors or weather which may change the conditions" and increase the probability of a spill; the "potential impact of a

expertise to provide "effective and immediate" responses to oil spills and to mitigate and prevent

identified threats. 33 U.S.C. § 1321(c)(1)(A).

As such, the FOSC's substantial threat determination should be considered akin to

traditional agency action under the APA, and thus it should not be disturbed unless it was arbitrary,

capricious, an abuse of discretion, or not otherwise in accordance with law. The majority of courts

to address the question have adopted such an approach. *Hyundai Merch. Marine*, 172 F.3d at 1191

(citing 5 U.S.C. § 706(2)(A)); *United States v. HVI Cat Canyon, Inc.*, 314 F. Supp. 3d 1049, 1071–72

(C.D. Cal. 2018); *In re Settoon Towing LLC*, 722 F. Supp. 2d 706, 709 (E.D. La. 2009); *cf. In re*

*Deepwater Horizon*, 2012 WL 5960192, at *14 ("[I]t would be improper for the Court to second guess

the FOSC's decision to use (or not use) a particular dispersant" in response to an oil spill.). *But see*

*United States v. Bros. Enters., Inc.*, 113 F. Supp. 3d 907, 915 (E.D. Tex. 2015) (apparently applying a *de*

*novo* standard). Indeed, courts regularly apply the APA's arbitrary-and-capricious standard when

reviewing agency response action under comparable environmental statutes. *See, e.g.*, *United States v.*

*JG-24, Inc.*, 478 F.3d 28, 32 (1st Cir. 2007) ("EPA's decision whether to conduct a removal action

[under CERCLA] is reviewed under the deferential 'arbitrary and capricious' standard. . . ." (citations

omitted)); *In re S. Scrap Material Co.*, 713 F. Supp. 2d 568, 591 (E.D. La. 2010) (Army Corps of

Engineers' actions under the Wreck Act are subject to the APA standard); *cf. Puerto Rico v. SS Zoe*

*Colocotroni*, 456 F. Supp. 1327, 1349–50 (D.P.R. 1978) (determining that civil penalties under the pre-

OPA Clean Water Act assessed by Coast Guard should be upheld unless they were arbitrary and

capricious), *aff'd in part, vacated in part on other grounds*, 628 F.2d 652 (1st Cir. 1980). This approach is all

the more compelling in situations like this one, where an agency must act quickly to fulfill its

---

discharge on the particular environment; and whether "action must be taken quickly to prevent a spill." OPA Operating Procedures, Ex. 1.s at 3-76.

statutory mandate to mitigate and prevent oil spills and protect public resources. *See* 33 U.S.C. § 1321(c)(1)(A); *Catanzaro*, 188 F.3d at 63.

To be sure, an FOSC's decision at the site of an incident does not quite fit the mold of a typical agency action reviewed under the APA. As the District Court in *Hyundai Merchant Marine* recognized, an FOSC's decision may not be an administratively appealable action, and later litigation to recover damages may be a responsible party's first meaningful opportunity to challenge that decision. *United States v. Hyundai Merchant Marine Co.*, No. A94-0391-CV, 1996 WL 254377, at 3 (D. Alaska, Jan. 26, 1996). However, a Court's consideration of the FOSC's decisions must give meaning to Congress' express delegation of the decision to response authorities at hand, as well as the express direction to mitigate or prevent a substantial threat of discharge; the Court should be wary of hindsight questioning that could chill timely, preventative action by an FOSC. The *Hyundai Merchant Marine* district court was "persuaded that the absence of a final administrative ruling does not mean that it is inappropriate for the court to use an arbitrary and capricious standard," and that "there is limited room for a defendant to dispute [an] FOSC's decision . . . ." *Id.* And the Ninth Circuit agreed: "[T]he United States may recover its costs unless its actions were arbitrary and capricious. *See* 5 U.S.C. § 706(2)(A). . . . OPA does not authorize the imposition of any higher standard." *Hyundai Merchant Marine*, 172 F.3d at 1191.

## 2. The Contemporaneous Documents Show the FOSC's Substantial Threat Determination Was Not Arbitrary or Capricious.

Judicial review of an agency's decision typically examines the basis for that decision, rather than tackling the issue anew and starting from first principles. "To review more than the information before the [agency decisionmaker] at the time she made her decision risks our requiring administrators to be prescient or allowing them to take advantage of post hoc rationalizations." *City of Taunton*, 895 F.3d at 127 (quoting *Walter O. Boswell Mem'l Hosp. v. Heckler*, 749 F.2d 788, 792 (D.C. Cir. 1984)); *cf. Olsen v. United States*, 414 F.3d 144, 155 (1st Cir. 2005) (permitting record review in

informal agency decisionmaking) (citing *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743–44 (1985)). Similarly, an FOSC's substantial threat determination and emergency response decisions should be evaluated in light of the information available to the Coast Guard at the time of the incident. *HVI Cat Canyon, Inc.*, 314 F. Supp. 3d at 1071; *United States v. Kilroy & Assoc.*, No. C08-1019-JCC, 2009 WL 3633891 at *5 (W.D. Wash. Oct. 30, 2009); *United States v. English*, No. CV00–00016ACKBMK, 2001 WL 940946, at *5 (D. Haw. Mar. 28, 2001).

To best ensure the focus of a review is on the evidence available to the decisionmaker at the time of the decision, a court's review is not only deferential, it is also usually confined to the administrative record. *E.g.*, *City of Taunton*, 895 F.3d at 127 (noting that judicial review should generally be limited to the basis for an agency's decision). Where a basis for an agency's decision can be rationally discerned from the documents supporting that decision, the Court should uphold it, rather than engage in an "exacting hindsight analysis." *Catanzaro*, 188 F.3d at 63; *see also Upper Blackstone Water Pollution Abatement Dist. v. EPA*, 690 F.3d 9, 20 (1st Cir. 2012) (citing *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 513–14 (2009)).

Some agency records include hundreds or thousands of pages of documents, reflecting a decisionmaking process that can take weeks, months, or occasionally years. *E.g.*, *City of Taunton*, 895 F.3d at 125. But not all agency decisions have the luxury of time. Here, the emergency posed by the grounded T/V *Margara* and OPA's mandate to provide an "effective and immediate" response dictated that the FOSC make his substantial threat determination within hours of the grounding, and move just as quickly to oversee the necessary response. There was no time to solicit proposals and hear arguments; the FOSC's emergency response decision was made in real time and in the face of an evolving situation. But the speed with which the FOSC was forced to decide whether the T/V *Margara* posed a substantial threat of discharge should not result in a more expansive review than is typically applied to administrative decisions, where judicial review is confined to the information

available to the decisionmaker at the time of the decision. *See HVI Cat Canyon, Inc.*, 314 F. Supp. 3d at 1072; *cf. Menkes v. Dep't of Homeland Sec.*, 486 F.3d 1307, 1314 (D.C. Cir. 2007) ("[I]t is common for the record to be spare in [informal adjudication]"); *accord City of Colo. Springs v. Solis*, 589 F.3d 1121, 1134 (10th Cir. 2009) (affirming agency action based on a sufficient, if "terse," record).

The documents that reflect the evolving situation at the scene of the incident and the Coast Guard response team's situational assessments have been collected in an index of contemporaneous decision documents. *See* Ex. 3 and 4. Though "terse," this compendium records the agency's real-time assessments and illustrates that the FOSC had every reason to make the substantial threat determination he did:

- The Notice of Federal Interest (NOFI), issued the morning of the grounding, proclaims "an oil pollution incident occurred or threatens to occur" at Tallaboa Bay. USCG_0017588.

- The Pollution Reports, generated throughout the response, describe the event as a "major" marine casualty; the Margara was carrying more than 300,000 barrels of No. 6 oil; the vessel was lifted on the reef and swinging slightly; and it was located in an "extremely environmentally sensitive" location. USCG_0011097 at 111098–99.

- The Federal Project Number Notification (FPN) reports the FOSC's substantial threat determination, which recites (at USCG_0011103, USCG_0011107):

    8.  FOSC DETERMINATION OF SUBSTANTIAL THREAT: Y.
    9.  DESCRIPTION OF SUBSTANTIAL THREAT: VESSEL GROUNDING IN TALLABOA PR.

- The Case Report and Resources at Risk Memorandum, reviewed by the FOSC, highlight the environmental sensitivity of the surrounding area—and the severe risks posed by a discharge of No. 6 oil into the bay. USCG_0011989.

- And the Environmental Sensitivity Index Maps, also reviewed by the FOSC, depict the area resources potentially at risk. USCG_0011259.

These contemporaneous documents clearly show that the FOSC determined that the grounded T/V *Margara* posed a substantial threat of discharge. They further support that determination by demonstrating the condition of the vessel—carrying more than 300,000 barrels of No. 6 fuel oil,

lifted and listing on the reef—and its proximity to sensitive natural resources. *Cf. Cape Flattery Ltd. v. Titan Maritime LLC*, 607 F. Supp. 2d 1179, 1181–82, 1189–91 (D. Haw. 2009) (accepting without further discussion that a tanker grounded on a coral reef gave rise to OPA liability as a substantial threat of discharge), *aff'd* 647 F.3d 914 (9th Cir. 2011). Consideration of the factors highlighted in these documents was also consistent with a Coast Guard regulation that defines a substantial threat of discharge to include groundings, 33 C.F.R. § 155.1020, as well as the Coast Guard's OPA Operating Procedures in effect at that time. OPA Operating Procedures, Ex. 1.s at 3-76. Far from arbitrary and capricious, the FOSC's determination was well within the "zone of reasonableness" and should be recognized as such. *Missouri*, 142 S.Ct. at 654.

### 3. As Explained by the FOSC and His Deputy, the Substantial Threat Determination Was Justified and Appropriate.

The handful of contemporaneous documents from the incident support the FOSC's substantial threat determination and suffice to show it was not arbitrary or capricious. Though not strictly necessary, declarations from the two Coast Guard Captains on hand at the incident offer context and insight into the decision, and further support that reasoned and appropriate determination.

Although courts ordinarily confine their review of agency action to the record as it existed at the time of the decision, supplementation of the record may be appropriate under certain limited circumstances. For example, the First Circuit Court of Appeals has recognized that a record may be "supplemented, if necessary, by affidavits, depositions, or other proof of an explanatory nature" where the new material is "explanatory of the decisionmakers' actions at the time it occurred." *Sierra Club v. Marsh*, 976 F.2d 763, 771–72 (1st Cir. 1992). Supplementation may also be useful to "illuminate reasons obscured but implicit in the administrative record," *Clifford v. Peña*, 77 F.3d 1414, 1418 (D.C. Cir. 1996); to contextualize or explain "highly technical, environmental matters," *City of Taunton*, 895 F.3d at 127; and "to facilitate effective judicial review." *Olivares v. Transp. Sec. Admin.*,

819 F.3d 454, 464 (D.C. Cir. 2016). Because the FOSC's substantial threat determination necessarily focused on real-time assessments of an emergency situation, the collection of contemporaneous documents is understandably thin. As such, the United States offers declarations from the FOSC and his deputy explaining the decisionmaking at the time of the incident. *See* Ex. 3 and 4. Although the contemporaneous documents on their own demonstrate that the determination was not arbitrary or capricious, these explanations further illustrate that the FOSC's substantial threat determination was reasonable, appropriate, and in line with the Coast Guard's own operating procedures regarding such decisions.

Captain Tunstall,[9] the FOSC and the Commander of Sector San Juan, considered the available information and affirmatively concluded that there was a substantial threat of discharge. Captain Tunstall was worried that the T/V *Margara*'s condition could stress the hull beyond what it would have been designed for. SOF ¶¶ 30–35. Early reports indicated that the vessel was listing, meaning it was moving slightly from port to starboard, and that it had experienced a decrease in draft, suggesting that the vessel's hull was sitting directly on the reef. SOF ¶¶ 30–32. Such conditions could stress the vessel's hull, which is ordinarily designed to evenly distribute the vessel's weight in water, potentially increasing the risk of discharge. SOF ¶¶ 32–33. Additionally, Captain Tunstall also worried that the T/V *Margara*'s position left it vulnerable to weather conditions that included two- to four-foot seas and ten-knot winds, which could increase stress on the vessel's hull and destabilize it. SOF ¶ 34.

The size and nature of the cargo and the kinds of other equipment typically on board an oil tanker like the T/V *Margara* also created a high risk that oil could discharge, and discharge rapidly. Although the double-walled hull offered additional protection from discharges from the cargo tanks,

---

[9] At the time of the incident, Captain Tunstall had experience with and had completed training in pollution response and emergency preparedness. SOF ¶ 25.

Captains Tunstall and Perry were both concerned that other parts of the vessel, like the pipes, hydraulic system, or bilges could also discharge oil. SOF ¶ 35. No. 6 fuel oil is generally considered to be a persistent oil with relatively low evaporation rates that can be transported significant distances by winds and currents. SOF ¶ 12. Consequently, it can be particularly damaging to the environment. SOF ¶ 13. And with more than 300,000 barrels on board, any breach of the hull threatened to discharge rapidly. SOF ¶¶ 11, 28.

Finally, the grounding's location in a remote area of the southern Puerto Rican coast meant that any discharge could seriously damage environmentally sensitive resources, with necessary response resources not easily available nearby. Captain Tunstall reviewed a Resources at Risk memo provided by representatives from the federal natural resource trustees, which showed that the T/V *Margara* was grounded in an area of dense coral reefs and just a few miles from coastal mangrove forests. SOF ¶¶ 36–40. In addition to serving as important habitat for numerous marine species, mangroves have thick roots that protrude above the waterline and are notoriously difficult to clean. SOF ¶¶ 37–38. No. 6 fuel oil could severely damage these environmentally sensitive areas. SOF ¶ 40. The remote location of the grounding meant that there were limited response resources immediately available, should a discharge occur. SOF ¶ 29. It was therefore entirely rational that Captain Tunstall determined that a substantial threat of discharge existed.

Captain Tunstall's assessment aligns with Coast Guard's OPA Operating Procedures, which directs FOSCs in how to determine whether a substantial threat exists, permitting access to the Fund. *See* OPA Operating Procedures, Ex. 1.s at 3-76. Captain Tunstall determined there was a high risk that oil would discharge. *See* SOF ¶¶ 27–29. With the vessel sitting three miles off the southern coast of Puerto Rico, the only barrier between the T/V *Margara*'s cargo of at least 309,000 barrels of No. 6 fuel oil (and oil from its piping, bilges, and related equipment) and navigable waters of the United States was the hull itself, which was in uncertain condition due to the stressors of the

grounding and weather. Sensitive resources would have been impacted by a discharge. In view of these facts, Captain Tunstall's decision was the easy and obvious choice—and was anything but arbitrary and capricious.

### 4. The Coast Guard's Actions Reflect a Real-Time Response to a Substantial Threat of Discharge.

Most courts have recognized that the substantial threat determination is appropriately left to the FOSC, as Congress contemplated, and that the APA's arbitrary-and-capricious standard is the proper framework for examining that determination. *See Hyundai Merch. Marine*, 172 F.3d at 1191; *HVI Cat Canyon*, 314 F. Supp. 3d at 1071–72; *In re Settoon Towing*, 722 F. Supp. 2d at 709. But even those few courts that have not proceeded in accordance with the APA have nonetheless focused on the circumstances of the determination and whether the Coast Guard's contemporaneous "words and deeds . . . bespeak a real-time assessment of a substantial threat of discharge." *Starr Indem. & Liability Co. v. Water Quality Ins. Syndicate*, 320 F. Supp. 3d 549, 574, 571–75 (S.D.N.Y. 2018) (concluding in an action between private parties that the Coast Guard's contemporaneous actions did not support a determination that a substantial threat of discharge existed); *accord Bros. Enters.*, 113 F. Supp. 3d at 915.

Here, the Coast Guard's words and deeds on April 27, 2006 tell a clear story: the T/V *Margara* posed a substantial threat of discharge of oil, and the situation warranted immediate intervention. Within hours of the grounding, the Coast Guard issued a NOFI to the master of the T/V *Margara* and opened the Fund, which are key contemporaneous events reflecting the Coast Guard's decision. *Compare* SOF ¶¶ 42–45 *with Bros. Enters.*, 113 F. Supp. 3d at 915 (finding a genuine factual dispute about whether a substantial threat existed due in part to the Coast Guard's failure to issue a NOFI to the responsible party, and that a salvage plan was developed three months after the incident). The Coast Guard also issued a Federal Project Number associated with the grounding, which affirmatively stated "yes" in answer to "substantial threat," and opened the Fund to cover its

response costs. SOF ¶¶ 42–43. Notably, payment from the Fund for natural resource damages claims cannot occur in the absence of either an actual discharge or a substantial threat of a discharge.[10] *See* 26 U.S.C. § 9509(c); 33 U.S.C. §§ 2712(a), 1321(c)(1).

The Coast Guard then oversaw response efforts, ordering the vessel to stop its own efforts to steer off the reef and instead wait for the tides and/or tugs to free the vessel. SOF ¶¶ 48–73. The crew was directed to perform regular soundings of the cargo holds to make sure any leak or discharge would be detected in short order. SOF ¶¶ 48, 51, 58, 60. Captain Tunstall flew in a helicopter over the grounded vessel to observe an attempt to free it. SOF ¶ 67. The Coast Guard set up a Unified Command, which developed salvage and lightering plans to mitigate the substantial threat that were to be enacted the next day. SOF ¶¶ 55–56, 63. As part of that response plan, the RP hired an Oil Spill Response Organization and a salvage contractor. SOF ¶ 64. The only reason those plans were not activated was because the vessel was freed relatively quickly. *Cf. Bros. Enterprises*, 133 F. Supp. 3d at 915. Meanwhile, containment boom was readied for deployment to contain any discharged oil and protect environmentally sensitive resources. SOF ¶¶ 65–66. Thus, the actions of the Coast Guard and of the RP during the incident reflect response personnel's sense of urgency, further confirming that the decision that the T/V *Margara* posed a substantial threat of discharge was not arbitrary and capricious.

Even if the Court were to reject the APA framework we argue here and consider the FOSC's decision *de novo*, the Court should confine its consideration of the "substantial threat" element to the evidence available to response officials at the time the decision had to be made. *HVI Cat Canyon*,

---

[10] The Coast Guard not only accessed the Fund to pay for any potential removal actions (meaning the costs of removing oil or the costs to prevent, minimize, or mitigate oil pollution from a substantial threat of discharge, 33 U.S.C. § 2701(14)) during the grounding and response, the Coast Guard's NPFC also later approved payment from the Fund on NOAA's claim for primary restoration implementation costs after careful review of the substantial threat determination. SOF ¶¶ 100–04.

314 F. Supp. 3d at 1072; *Kilroy*, 2009 WL 3633891, at *5; *English*, 2001 WL 940946, at *5. During

NPFC's review of NOAA's interim claim for primary restoration costs, SIGCo submitted comments

challenging the FOSC's determination by pointing out that, following the incident, a hull inspection

revealed the T/V *Margara* had not suffered significant damage, and that the vessel was allowed to

sail without further maintenance or repair. True enough—but such evidence was out of reach when

the critical decision to intervene had to be made, and it does nothing to diminish the Coast Guard's

sense of urgency—reflected in its words and deeds—to address the risks posed by the T/V

*Margara*'s grounding. As the Ninth Circuit noted in *Hyundai Merchant Marine*:

> Hyundai argues that the United States should not have a blank check permitting it to
> undertake all kinds of unnecessary and unreasonable actions at Hyundai's expense. It
> is worth pointing out in passing, however, that many of the actions that Hyundai now
> regards as unreasonable or unnecessary appear so, if at all, only by hindsight. The
> grounding of the Hyundai No. 12 contained the seeds of a major ecological disaster.
> In the circumstances, it was only prudent for the government to rush personnel and
> equipment to the scene and maintain them there until the threat was over.

172 F.3d at 1191. There is no question that the grounded T/V *Margara* contained all the seeds of a

major ecological disaster. The Coast Guard's words and deeds reflect as much. And second-guessing

the FOSC's determination by entertaining post hoc analyses would unravel the entire prevention and

mitigation protocol established in OPA and undermine Congress' effort to structure *expeditious*

responses to substantial threats. *See* S. Rep. 101-94 at 2 (emphasizing the need to "provide quick

efficient cleanup, minimize damage to fisheries, wildlife, and other natural resources[,] and

internalize those costs within the oil industry and its transportation sector"); *see also In re Deepwater

Horizon*, 2012 WL 5960192, at *14 ("[I]t would be improper for the Court to second guess the

FOSC's decision to use (or not use) a particular dispersant" in response to an oil spill.).

5.    **The T/V *Margara* Was a Vessel in Navigable Waters of the United States, and the Response to the Incident Caused Damages to Natural Resources.**

There is no serious dispute regarding the remaining elements of the United States' claim

against the RP and Guarantor. Ernst Jacob admits that it was the operator of the T/V *Margara,* and

SIGCo admits that it was the guarantor. Ernst Jacob Answer ¶¶ 31–34; SIGCo Answer ¶¶ 33–34. OPA defines "vessel" as "every description of watercraft or other artificial contrivance used, or capable of being used, as a means of transportation on water, other than a public vessel." 33 U.S.C. § 2701(37); Ernst Jacob Answer ¶ 1 (admitting that the T/V *Margara* was a 748-foot tanker). The T/V *Margara* was an oil tanker transporting at least 309,000 barrels of oil to Puerto Rico. Ernst Jacob Answer ¶ 37; SOF ¶ 11. The incident occurred three miles off the southern coast of Puerto Rico in the Caribbean Sea, in navigable waters within the United States' jurisdiction. *See* 33 U.S.C. § 2701(21) (defining "navigable waters" as "waters of the United States, including the territorial sea."); Ernst Jacob Answer ¶ 1 (admitting the grounding occurred off the coast of Tallaboa).

The final element to the United States' OPA claim is only partially before the Court at this time. OPA permits the recovery of damages caused by the substantial threat of discharge into navigable waters. *See Gatlin Oil Co. v. United States*, 169 F.3d 207, 210–11 (4th Cir. 1999). Here, reefs damaged by propwash and the desolation of the second grounding at the Northern Impact Area resulted from efforts taken in response to the substantial threat of discharge posed by the T/V *Margara*. *See* SOF ¶¶ 70–72, 81–89. Although the defendants dispute the *scope* of the natural resource damages that resulted from the Incident, the *fact* of a compensable injury is beyond question. *See* Ernst Jacob Answer ¶ 55 ("[i]t is admitted that the ship injured natural resources under the trusteeship of the United States and Puerto Rico. The extent of said damage is in dispute.").

## CONCLUSION

Here, OPA worked as intended: when an oil tanker full of No. 6 fuel oil found itself imperiled upon a coral reef off the coast of Puerto Rico, the Coast Guard mobilized a response that freed the tanker within a day. Fortunately, no oil was spilled. The Coast Guard's determination that the T/V *Margara* posed a substantial threat of discharge of oil prompted a swift and ultimately successful response, which nonetheless resulted in damaged natural resources. Under OPA, damages

to natural resources caused by such a substantial threat of discharge are cognizable against responsible parties and their guarantors. Therefore, the United States is entitled to a determination that the RP and Guarantor are liable for natural resource damages as a matter of law.