UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
|     *Plaintiff*, and | |
| DEPARTMENT OF NATURAL AND ENVIRONMENTAL RESOURCES OF THE COMMONWEALTH OF PUERO RICO, | |
|     *Plaintiff-Intervenor*, | |
|     v. | |
| ERNST JACOB and SHIPOWNERS INSURANCE AND GUARANTY COMPANY LTD, | |
|     *Defendants* | Civil Action No. 3:21-cv-1594-SCC-MEL |

| | |
|---|---|
| SHIPOWNERS INSURANCE AND GUARANTY COMPANY, LTD. | **PLAINTIFF UNITED STATES' CONSOLIDATED BRIEF OPPOSING DEFENDANTS' MOTION [100] TO DENY SUMMARY JUDGMENT AS PREMATURE AND THEIR MOTION [101] TO STRIKE DECLARATIONS AND DOCUMENTS** |
|     *Third-Party Plaintiffs* | |
|     v. | |
| MARGARA SHIPPING COMPANY LTD, and STEAMSHIP MUTUAL UNDERWRITING ASSOCIATION, LTD. | |
|     *Third-Party Defendants.* | |

| | |
|---|---|
| ERNST JACOB, | |
|     *Third-Party Plaintiffs* | |
|     v. | |
| STEAMSHIP MUTUAL UNDERWRITING ASSOCIATION, LTD., | |
|     *Third-Party Defendants.* | |

Alongside their Opposition to the United States' Motion for Partial Summary Judgment, Defendants filed a motion pursuant to Federal Rule of Civil Procedure 56(d) seeking discovery (ECF 100) and a Motion to Strike certain declarations and documents (ECF 101).[1]

In their Rule 56(d) motion, Defendants pose several questions they would like answered before the merits of the case are resolved. But just because a question may be answerable does not make that answer relevant—or discoverable—in litigation. The discovery demanded by the Defendants here is largely hopeless, pointless, or both, and Defendants fail to connect the dots between the information they seek and how it could possibly influence the outcome of the United States' motion for partial summary judgment.

After demanding more information with their first motion, Defendants attempt to shrink the record to the vanishing point by asking the Court to strike the declarations and documents filed in support of summary judgment. But those documents—including the administrative files from two agencies engaged in this case, custodial declarations establishing the files' authenticity, and the sworn declarations of individuals with first-hand knowledge of the incident—are properly before the Court and available for the Court's consideration.

## BACKGROUND

Evaluating Defendants' arguments for more (ECF 100) and less (ECF 101) information must begin with understanding how we got here and what information has been exchanged already. In April 2006, the Coast Guard rushed to the scene of the *Margara*'s grounding. Upon determining the incident posed a substantial threat of discharging oil, the Federal On-scene Coordinator (FOSC) oversaw a rescue effort. Though the FOSC did not separately explain his substantial threat determination at that time, the Agency's contemporaneous records document the evolving scene:

---

[1] Pursuant to Local Rule 7(e), the United States is allowed 15 pages for its opposition to each of Defendants' motions. We have consolidated our oppositions to both motions to this single brief.

| Local Time<br>April 27, 2006 | Event | Record Citation<br>(ECF .pdf page #) |
|---|---|---|
| 1:15 AM | The Coast Guard is notified that *Margara* has grounded. | (ECF 69-6) at 17<br>[USCG_0006268] |
| 1:30 AM | The Coast Guard is told the vessel is trying to come off the reef. Sector San Juan instructs vessel to stop efforts. | (ECF 69-6) at 17<br>[USCG_0006268];<br>(ECF 69-4) at 226<br>[USCG_0011208] |
| 2:20 AM | Vessel's master reports *Margara*'s draft pre-grounding was 11.28 meters; post-grounding it was 11.2 meters. | (ECF 69-6) at 17<br>[USCG_0006268] |
| 2:42 AM | Sector San Juan reports: "M/V Margara, 740 ft [double] hull tanker, Cayman Island Flag, ran hard aground 3 NM S Tallaboa . . . . Cargo 308,809 barrels of #6 fuel oil. No [pollution]. Tug [on-scene]." | (ECF 69-6) at 29<br>[USCG_0011112] |
| By 3:40 AM | Coast Guard respondents now aboard the vessel report reduced draft of the *Margara*. | (ECF 69-6) at 57<br>[USCG_0011140] |
|  | At the Coast Guard's direction, the vessel implements its Vessel Response Plan; the *Margara*'s master contacted the vessel's qualified individual on shore. | (ECF 69-6) at 17<br>[USCG_0006268];<br>(ECF 104-7) at 2<br>[USCG_0010340] |
| By 6:26 AM | NOFI is issued to *Margara*'s master, which notes a "pollution incident . . . threatens to occur . . ." | (ECF 69-6) at 14, 31<br>[USCG_0017588,<br>USCG_0011114] |
| 8:09 AM | "A contingency boom has been put in place in the event a spill occurs." | (ECF 69-6) at 32<br>[USCG_0011115] |
| 9:25 AM | A Federal Project Number (FPN) is issued and notes: "FOSC DETERMINATION OF SUBSTANTIAL THREAT: Y." | (ECF 69-6) at 23<br>[UCSG_0006265] |
| By 11:00 AM | Multiple attempts to pull the vessel from the reef using tug boats during the high tide cycle have failed and the *Margara* remains "hard aground." | (ECF 69-6) at 19, 33<br>[USCG_0006270 &<br>USCG_0011116] |
| Afternoon | Vessel is moved a short distance from its original position before regrounding. | (ECF 69-6) at 20<br>[USCG_0006271];<br>(ECF 105-5) at 3<br>[USCG_0010255] |
| 7:00 PM | T/V *Margara* "remains aground . . . in extremely environmentally sensitive" area. A unified command post is up, and a safety zone is secured around the vessel. Responsible Party has hired an Oil Spill Removal Organization (OSRO) and a salvage contractor. | (ECF 69-6) at 35<br>[USCG_0011118]<br><br>Envtl. Res. Maps<br>(ECF 69-6) at 116–22 |
| 11:09 PM | Vessel is going through another high tide cycle and appears to be breaking loose. | (ECF 69-6) at 33<br>[USCG_0011117] |

Once the *Margara* was safely refloated, the natural resource Trustees undertook emergency restoration efforts and began assessing the scope of natural resource damages, often shoulder-to-shoulder with Ernst Jacob or representatives of the Defendants. After *years* of study and negotiations regarding the need for additional restoration,[2] the Trustees issued a notice of intent to conduct restoration planning in March 2013, a notice that recited the jurisdictional assessments, the substantial threat assessment, and the up-till-then cooperation of Ernst Jacob.[3] Shortly thereafter, Ernst Jacob's representatives announced that Margara Shipping—the owner of the vessel—had declared insolvency and walked away from both the restoration efforts and the negotiating table. That, in turn, prompted the Trustees to formalize and finalize their restoration plan, and present the plan to the NPFC for funding.

Faced with a claim for natural resource damages, but having no detailed, close-in-time description of the FOSC's substantial threat determination from the FOSC himself, the NPFC examined the record of contemporaneous documents before it and interviewed the FOSC and other responding officers to assess the matter.[4] Notes of that conversation were preserved in the NPFC's administrative record (and have been provided to the Defendants).[5] The Defendants submitted would-be expert opinions arguing the grounding did not pose a substantial threat, and the NPFC considered those arguments.[6] Ultimately, the NPFC concluded that the FOSC's substantial threat determination aligned with the available record of the incident and should not be second-guessed.

---

[2]  Described more thoroughly in the United States Reply Brief in Partial Summary Judgment briefing, filed concurrently with this brief, at 1–3.

[3]  *See* PRDNER and NOAA's Notice of Intent to Conduct Restoration Planning Pursuant to 15 C.F.R. § 990.44 (Ex. 4 [NOAA-0172011]), March 6, 2013.

[4]  *See* NPFC's Final Adjudication of Trustee's Joint Claim for Primary Restoration Funds (ECF 69-4) at p.17/271 n.42; *see also* Defs. Opp. Ex. Q (ECF 104-6) (email from Captain Tunstall to NPFC).

[5]  *See* Note to File: PHONECON on September 25, 2018 (Ex. 13 [USCG_0011251]).

[6]  *See* NPFC's Final Adjudication, *supra* n.4, at pp.17-20/271.

During the NPFC's review and consideration, Defendants submitted *eleven* Freedom of Information Act requests regarding the incident. (Parish Decl. (ECF 112-6) ¶ 5). Additionally, before[7] this action was filed, FOSC Captain Tunstall and his Deputy Commanding Officer Captain Perry provided sworn declarations describing their determinations and explaining the history of the incident and their decision-making as it was captured in the (admittedly terse) record of contemporaneous documents, which were cited by and provided with the declarations. (ECFs 69-6 and 69-7, respectively). And after filing this case, the United States collected, processed, and produced the centralized files containing information regarding the incident from both NPFC and NOAA. That included, among other things:

1. NOAA's Administrative Record for the Trustees' Natural Resource Damages Assessment in response to the 2006 T/V *Margara* Grounding Incident;

2. NOAA's documents provided in response to the RP and/or Guarantor's numerous FOIA requests to NOAA related to the 2006 T/V *Margara* Incident;

3. The documents associated the Margara Incident in ResponseLink, a database maintained by NOAA as a central repository for incidents that arise under the Oil Pollution Act;

4. NPFC's Administrative Record for its Determination and Reconsideration of NOAA's Claim for Primary Restoration Costs for the 2006 T/V Margara Incident (which include documents from NPFC's CPS II database, its central repository for all documents collected and reviewed in relation to filed claims); and

5. NPFC's documents collected in response to the Guarantor's August 23, 2017 FOIA request, seeking the NPFC's "full investigation file" pertaining to the 2006 T/V Margara incident.

*See* U.S. Initial Disclosures (Ex. 14) at 5; Suppl. Production Letter (Ex. 15); Nance Decl. (Ex. 7) ¶¶ 1, 3; Tarpley Decl. (Ex. 5). The Agencies' Administrative Records produced to the Defendants already have been certified as complete. *See* MacLean Decl. (Ex. 1) ¶ 6 & Nance Decl. (Ex. 7) ¶ 4. All told, those productions included 738 documents and more than 12,000 pages of material.

---

[7] Not after, as the Defendants contend. *Compare* Coast Guard Captain Declarations (ECFs 69-6 at 10, 69-7 at 8) (dated in April 2021) *with* Complaint (ECF 1) (filed in December 2021).

Finally, while preparing this brief, the United State became aware of roughly 80 documents (181 pages) held in the electronic "archive" folders of Coast Guard Sector San Juan that had not been processed and produced for purposes of this litigation. For the sake of completeness and transparency, and concurrent with this filing, the United States is producing these documents to Defendants as a supplement to our initial disclosures. As is readily apparent its face, this production does not offer new insights into material facts at issue in the case. Rather, these documents either duplicate others that the Defendants already have from other productions, or they echo facts already recorded elsewhere in the certified administrative record. However, since the necessity and scope of further discovery is a matter squarely presented by the Defendants' 56(d) motion, we have attached the entire supplemental production as an exhibit to this brief so the Court can better evaluate the Parties' various discovery arguments. *See* United States' Jan. 27, 2023 Consolidated Supplemental Production (Ex. 17).

Ultimately, the record already compiled for—and disclosures already made to—the Defendants regarding the FOSC's substantial threat determination exhaustively document the decision and should suffice for this Court's review.

## LEGAL STANDARD

Absent a court order or local rule to the contrary, "a party may file a motion for summary judgment <u>at any time</u> until 30 days after the close of all discovery." Fed. R. Civ. P. 56(b) (emphasis added). "The control of discovery and the admission of evidence is within the discretion of the trial court." *Smith & Wesson, Div. of Bangor Punta Corp. v. United States*, 782 F. 2d 1074, 1082 (1st Cir. 1986). Parties "possess[ ] no absolute right to additional time for discovery under Rule 56." *Emmons v. McLaughlin*, 874 F.2d 351, 356 (6th Cir. 1989). In order to resist a summary judgment motion as premature under Rule 56(d), a nonmoving party must show additional time for discovery is warranted "by affidavit or declaration that, for specified reasons, it cannot present facts <u>essential</u> to

justify its opposition." Fed. R. Civ. P. 56(d) (emphasis added). Such a showing requires the nonmoving party to:

> (i) explain[ ] his or her current inability to adduce the facts essential to filing an opposition, (ii) provide[ ] a plausible basis for believing that the sought-after facts can be assembled within a reasonable time, and (iii) indicate[ ] how those facts would influence the outcome of the pending summary judgment motion.

*See Rivera-Almodovar v. Instituto Socioeconomico Comunitario, Inc.*, 730 F.3d 23, 28–29 (1st Cir. 2013). While a court should "construe motions that invoke the rule generously," *Emigrant Residential LLC v. Pinti*, 37 F.4th 717, 724 (1st Cir. 2022), Rule 56(d) cannot be used in "hope[s] of finding a proverbial 'smoking gun,'" and motions "based on nothing more than mere speculation [that] amount[s] to a fishing expedition" should be denied. *Davis v. G.N. Mortg. Corp.*, 396 F.3d 869, 885 (7th Cir. 2005) (denying Rule 56(d) motion that failed to set forth evidence that the discovery sought would create a genuine issue of material fact).

Once an agency official has made a decision committed to their discretion, courts generally weigh that decision using the arbitrary and capricious standard, considering the evidence available to the decision-maker at the time. Courts can consider supplemental affidavits and other post-decision as a part of that review, so long as those materials are "explanatory of the decisionmakers' actions at the time it occurred" and do not present "new rationalizations" for the decision. *See Sierra Club v. Marsh*, 976 F.2d 763, 772–74 (1st Cir. 1992) (describing record supplementation and judicial review). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4); *see also Ferring Pharma. v. Braintree Laboratories, Inc.*, 215 F. Supp. 3d 114, 120–21 (D. Mass. 2016). However, custodians of public records, which are generally admissible under FRE 803(6) and (8), must only have "personal

knowledge" of the custodial status, not first-hand knowledge of the actual events described in the documents. *See* 31 Wright & Miller, Federal Practice & Procedure § 7112 (2d ed.).

## ARGUMENT

The Parties' dispute has less to do with any material facts and more to do with how to review and consider them. Defendants insist that a substantial threat determination must be made by a federal court following a forensic analysis of every possible shred of evidence, while Plaintiffs maintain that—as the statute's provisions reflect—the substantial threat determination was given to the Coast Guard's FOSC in the first instance, and should only be overturned on a showing it was arbitrary or capricious. As described in the United States Reply brief, Defendants' substantive argument relies on a take-some, leave-some approach to statutory construction that would dismantle Congress' enactment and undermine OPA entirely. *See* Defs. Opp. (ECF 99-1) at 10–18. It fails, first and foremost, as a matter of law based on the statutory text.[8] But Defendants' twin motions seeking both more and less information regarding the case underscore just how untenable that worldview is. Neither the Defendants' demands for further discovery (ECF 100) nor their efforts to strike essentially *all* declarations and documents about the incident should be given quarter.

### I.     Defendants Seek Nonexistent Documents, Irrelevant Information, and Further Delay; Their Rule 56(d) Motion Should Fail.

To establish a summary judgment motion is premature, a nonmoving party should:

articulate some plausible basis for the party's belief that specified "discoverable" material facts likely exist which have not yet come in from the cold. There must also

---

[8]     Briefly: Defendants point out that OPA grants district courts "exclusive jurisdiction" over disputes arising under the statute, and then argue *every* dispute must be decided in the first instance by a trial court applying a *de novo*, preponderance-of-the-evidence standard. Defendants' MPSJ Opposition (ECF 99-1) at 14–15 (citing 33 U.S.C. § 2717(b)). But Defendants fail to recognize that parallel statutory provisions hand disputes to the Executive branch for resolution in the first instance: the substantial threat determination goes to the FOSC (33 U.S.C. §§ 1321, 2702 and implementing regulations), claims adjudications to the NPFC (33 U.S.C. § 2713 and implementing regulations), and natural resource damage assessments to the Trustees (33 U.S.C. § 2706(e)(2))—all decisions that should be credited with some level of deference in subsequent court proceedings.

be shown some realistic prospect that the facts can be obtained within a reasonable (additional) time, and will, if obtained, suffice to engender an issue both genuine and material.

*Vargas-Ruiz v. Golden Arch Dev., Inc.*, 368 F.3d 1, 4 (1st Cir. 2004) (*quoting Paterson-Leitch Co. v. Mass. Mun. Wholesale Elec. Co.*, 840 F.2d 985, 988 (1st Cir. 1984)). Here, Defendants have failed to meet their burden to show that the discovery they want exists, that it is relevant, or that its continued pursuit is proportional to the needs of the case. *Cf. id.*; Fed. R. Civ. P. 26(b)(1). Instead, in their Rule 56(d) Motion—and in discovery served upon the United States in its wake—Defendants seek documents that do not exist, decades of records from *other* cases that might shed light on establishing the question of liability here, and information already in their custody or control. Ultimately, there are few—if any—lingering questions that warrant further delays. However, should the Court conclude that further discovery is warranted, the United States asks that it be tailored to address only those specific holes in the record that can be filled, for example, by confining further discovery to only the deposition of FOSC retired Captain Tunstall.

A.   Defendants' Requested Discovery Is Unwarranted And Unnecessary

The discovery demanded by Defendants is largely non-existent, irrelevant, or both.

First, Defendants complain that the United States has not produced a copy of the FOSC's substantial threat determination from the time of the incident. (ECF 100 at 8.) But there is no such document—and Defendants know it. Indeed, Defendants' own supporting declaration emphasizes this very fact, noting that internal NPFC emails discuss the lack of a specific decision document while that office was reviewing the Trustees' primary restoration claim. *See* Parrish Declaration (ECF 112-6) ¶ 6 (discussing Nance Email at ECF 104-5 [USCG_0012611]). According to Defendants, the cited emails expose gaps in the United States' production and indicate there are material facts yet undisclosed and unexplored. *Id.* It takes a mighty twist of logic to turn a discovery production that confirms the *absence* of further documentation into justification for *more* discovery. Indeed, a closer

look at this exchange only highlights the United States' position that the Coast Guard's FOSC should be entrusted with the substantial threat determination,[9] and that the record already provides ample support to uphold that decision here.[10] In any event, the FOSC here did not specifically document his substantial threat determination immediately following the incident, though internal guidelines suggest he should have. The record is what it is, and the tools of civil discovery— powerful though they may be—cannot call non-existent documents "in from the cold." *Cf. Vargas-Ruiz*, 368 F.3d at 4.

Next, unable to identify specific, relevant, and existing files that have not already been turned over in this case, Defendants make sweeping demands for incident reports and records from *other* cases. Defendants insist they need "[d]iscovery into other ship groundings and whether those groundings resulted in any discharge of shipboard oil, or were declared substantial threats." *See* Parrish Declaration (ECF 112-6) ¶ 23(j).[11] SIGCo's recently-served interrogatories expand on this, demanding that the United States:

> Identify each occasion between May 1994 and May 2006 on which the NPFC has issued a Federal Project Number. For each such occasion, state the name of the vessel or facility involved; the Federal Project Number; the date the Number was issued; the name of the FOSC; and the circumstance justifying the issuance of a Federal Project

---

[9]     "Generally, we are comfortable deferring to an FOSC's determination that a vessel poses a substantial threat," notes Mr. Hernandez. (ECF 104-5 [USCG_0012611] at -612). "[N]ormally we would rely on the FOSC's call that a substantial threat exists – as he/she is the only person that can make that determination," agrees Mr. McCrossen. *Id.* At -611.

[10]    Mr. Hernandez notes that the Fund was opened at the time of the incident to pay for response costs, and reasons "the opening of the Fund suggests that a substantial threat determination was made at some point, even if we have no record of it, right?" *Id.* at -612. "I think all of the elements of an OPA event occurred," concludes Mr. McCrossen after examining the record. *Id.* "It may seem as if [the code used by a case manager to close the *Margara* case] could be viewed by some parties to indicate 'no substantial threat' was evident. To the contrary, we wouldn't have allowed costs if one of the elements [of OPA liability] was missing," concurs Mr. Bella. *Id.*

[11]    As explained by Defendants' proffered expert, "It would be interesting to see the circumstances of [other] cases and what threat levels for structural damage and pollution they were assigned at the time and in retrospect." Burthem Declaration (ECF 112-3) at ¶ 6.1.4. Of course, "interesting" is not the same as "relevant."

Number (such as a substantial threat of a given size of discharge or an actual discharge of a given quantity, and what substance was threatened or was actually discharged).

SIGCo's First Set of Interrogatories (Ex. 17) No. 13; *see also* SIGCo's First Set of RFPs (Ex. 18) Nos. 30, 31. So, in Defendants' view, the Parties must explore—and the Court must adjudicate—more than a decade of *other* incidents before resolving *this* case. Defendants claim they "need to obtain records directly from the Coast Guard to test a simple proposition: How often have comparable groundings actually resulted in oil discharges?" (ECF 100 at 13). But, far from a "simple proposition," this is a rabbit hole. Defendants demand the opportunity to collect evidence and craft arguments about which historic incidents were "comparable" to the *Margara* grounding, presumably to then investigate whether those paper trails ran parallel to the record here. This play for delay should not be indulged.

The Coast Guard responds to a tanker vessel grounding like the *Margara* with urgency, and response authorities invariably face an evolving situation and an incomplete set of facts. The FOSC here determined that the *Margara*—a loaded and grounded oil tanker in need of rescue off Puerto Rico's south coast—posed a substantial threat of discharge warranting intervention. The sole liability question that remains is whether the FOSC's decision was justifiable. Rather than attend to the question at bar, Defendants hope to put the program itself on trial. But sifting through decades of other case records will not help this Court resolve whether the FOSC's substantial threat determination *in this incident* was arbitrary or capricious, nor whether the T/V *Margara* incident meets the elements of liability established by the statute.

Finally, many of Defendants' discovery demands plead for documents that have always been in their own custody or control. They demand, for example:

- "Fact discovery concerning the ship's condition and maintenance history,"

- "Discovery . . . of the ship's instrumentation, log books, and post-grounding conditions, including sounding reports,"

- "[T]he shipboard records, including bilge volume and pumping, draft volume, listing[,] . . . tank condition and volume, weight distribution, bulkhead sealings, and more," and

- "Maintenance records and reports of the hull's condition and other protective systems on the ship."

Parrish Declaration (ECF 112-6) ¶¶ 24, 25(d), (e). In the 17-year history of this case, Defendants have apparently never bothered to collect or consider this information, including when they argued this precise issue to the NPFC while it considered NOAA's claim for primary restoration costs. Their demands for their own documents do not warrant further delay. *Accord Emmons*, 874 F.2d at 357 ("Given the nature of [the non-movant's] allegations, however, we believe that his right to further discovery hinged not upon information in [his opponent's] control, but instead upon facts that, if they existed, should have been within [his] personal knowledge.").

    B.   <u>Defendants' Requested Discovery Is Disproportionate To The Needs Of The Case.</u>

    As the Defendants already told this Court, the "development of the law and facts involved in this incident are in an advanced stage." (ECF 43 ¶ 2). Indeed, according to Defendants, "though early in the life of this litigation, it is not early in the life of the dispute nor in that of the parties' efforts to resolve the dispute." (ECF 41 ¶ 5). The United States agrees. Even if they can lay claim to some marginal relevance, Defendants' demands for further discovery into every other vessel grounding for which the Coast Guard mustered a response in the 12 years prior to the *Margara* incident are grossly disproportionate to the needs of the case. *Compare* SIGCO's First Set of Interrogatories (Ex. 17) No. 13 (demanding 12 years of maritime casualty records) *with SEC v. Navellier & Assoc., Inc.*, Civ. No. 17-11633-DJC, 2019 WL 688164 at *2 (D. Mass. Feb. 19, 2019) (request for a 30(b)(6) designee to testify about 137 separate entities and the enforcement decisions in *other* cases overbroad—indeed, an "egregious example" of disproportionate discovery).

Like Defendants' requests to survey the entire history of operations of the Fund under OPA, Defendants insist in their motion, in their exhibits, and in their recently-served discovery that they should be allowed to depose anyone with a passing knowledge or memory of the incident—including the ship's captain, master, crew, the tug operators and tug crew, the Rear Admiral in charge of six Coast Guard sectors, and other first responders.[12] Of course, unlike a Federal On-Scene Coordinator, none of these individuals is designated by statute or regulation to determine whether an incident poses a substantial threat of discharge. *Accord* 33 U.S.C. § 1321 (directing the Government to "ensure . . . mitigation or prevention of a substantial threat of a discharge"); 40 C.F.R. § 300.130(b) (the Coast Guard "is authorized to initiate and, in the case of a discharge posing a substantial threat to public health or welfare of the United States is required to initiate and direct, appropriate response activities when the [Secretary] determines . . . there is a substantial threat of discharge"); *id.* § 300.120(b) ("USCG Captains of the Port shall serve as the designated [FOSCs] for areas in the coastal zone").

In an effort to show their sweeping demands for depositions *might* lead to relevant testimony, Defendants provide a declaration from Mr. Alex Cruz, the harbor pilot that boarded the *Margara* after her April 2006 grounding. (ECF 102-1.) But Mr. Cruz's declaration only highlights the irrelevance of Defendants' discovery plan. Mr. Cruz's declaration is a parade of conclusory assertions tailored to contradict the statements of Captains Tunstall and Perry—assertions that, by the look of things, even Defendants recognize lack "substance" and support. (ECF 102-2) at 2.[13] Nothing in Mr. Cruz's declaration contradicts the critical facts of this case: the vessel was grounded

---

[12]    *See* Burthem Decl. (ECF 112-3) ¶ 6.20.2; Parrish Decl. (ECF 112-6) ¶ 23(d).

[13]    After bluntly contradicting Captain Tunstall's declaration by declaring, "The vessel status and movements did not create a significant risk that the hull's integrity was or could soon become compromised," Mr. Cruz's filed declaration retains a bracketed note which reads: "this just repeats the statement – can he give some substance to this conclusion?" (ECF 102-1 at 2).

in an environmentally sensitive area, fully loaded with oil, and required an emergency response. *Id.* at 1–2. And Defendants have not suggested—by affidavit or otherwise—that competent evidence could or would be discovered that place those material facts in genuine dispute. Defendants may hope to collect testimony that contradicts the FOSC's considered judgment, but the collected recollections of a smattering of individuals without a complete sense of the scene or the legal duty to protect the public and its natural resources cannot turn a reasonable determination into an arbitrary and capricious one. Under the longstanding precedent that courts consider the determinations of FOSCs under the arbitrary and capricious standard, the globe-trotting tour of depositions demanded by Defendants is irrelevant and unnecessary. *See* Plaintiff's MPSJ (ECF 69-1) at 14–15. But even under a *de novo* standard, any marginal relevance such discovery might have pales in comparison to the burdens of its collection. *Cf.* Fed. R. Civ. P. 26(b)(1).

Defendants' joint motion leans heavily on the argument that they should be awarded further discovery here because SIGCo was unaware of the incident or its potential liability until 2017. Apparently, T/V *Margara*'s Guarantor did not know that the vessel had grounded; or that Ernst Jacob helped early natural resource damage assessments; or that the Trustees publicly announced their intent to implement natural resource restoration efforts. *Compare* Clemens Decl. (ECF 102-3) ¶ 9 (proclaiming ignorance) *with* SOF Responses (ECF 112-4) ¶¶ 16, 91, 93) (admitting facts). Of course, OPA imposes strict liability on responsible parties and guarantors. 33 U.S.C. §§ 2702(a), 2716(f). The statute obliges a guarantor to pay for natural resource damages; the statute does not oblige Trustees to manage a guarantor's business, or keep guarantors apprised of their developing financial obligations regarding the very vessels they guarantee. There was nothing secret about the incident, and Ernst Jacob was on hand throughout. If SIGCo did not recognize the possibility of a financial obligation associated with the incident until 2017, the company has only itself—and its co-defendant—to blame. In any case, Defendants admit that the Trustees complied with OPA's notice

requirements in 33 U.S.C. § 2713(a), so the argument is of no moment. *See* US SOF (69-2) and Def. Response (112-4) ¶¶ 97–98; *accord Borges ex rel. S.M.B.W. v. Serrano-Isern*, 605 F.3d 1, 5 (1st Cir. 2010) ("A fact is 'material' if its existence or nonexistence has the potential to change the outcome of the suit.) (citations omitted).

And in the five years since SIGCo has tuned in, the company has issued *eleven* FOIA requests (ECF 112-6 ¶ 5), participated in an administrative review of the FOSC's decision (US SOF (69-2) and Def. Response SOF (112-4) ¶¶ 100–01), and received disclosures that include the non-privileged contents of the central repositories of information regarding the incident maintained across two separate federal offices, totaling more than 700 documents and 12,000 pages. In addition, the two senior most Coast Guard officials that responded to the incident—including the FOSC Captain Tunstall himself—have written declarations explaining the substantial threat determination and the record of the Coast Guard's activities at the scene of the incident.

Defendants are sure to point to the United States' concurrent production of documents as a sign that more discovery would be productive in this case. On the contrary, this production only highlights that the burdens of additional discovery will outweigh any likely benefit to the case. Here, one of Defendants' 2017 FOIAs sent to Coast Guards Sector San Juan sought the Agency's "incident investigation" file. That FOIA was referred to a Coast Guard headquarters office, which collected documents—including pertinent documents from Sector San Juan—and responded to the request. The documents produced alongside this brief were gathered by casting a wider net and collecting directly from the electronic "archive" folders of Coast Guards' Sector San Juan office by searching for any use of the term "Margara." The results (consolidated in Exhibit 16) are either

duplicates of documents Defendants already have—and have even already cited in this case[14]—or the penumbral documentation reflecting facts already recorded in the record that has already been compiled and processed again and again.[15] In the end, this production underscores that there are no stones left to turn over in search of relevant information—there are only pebbles at best.

      C.   <u>Any Discovery Awarded Should Be Narrowly Tailored To The Needs Of The Case.</u>

      Defendants' demands for additional discovery should be addressed with an eye to both the needs of the case and the operation of the law in other cases. Defendants claim in their summary judgment Opposition brief that denying deference to the FOSC's substantial threat decision "[will] not risk deterring the Coast Guard from carrying out its mission to respond to emergencies." (ECF 99-1 at 18). That is a bold and misguided claim since, under Defendants' worldview, the Coast Guard has no authority to decide whether an incident *is* an emergency to which it should respond. (*Id.* at 14–17). That decision, say the Defendants, must first be adjudicated by a federal district court following the analysis of third-party experts and protracted civil discovery.

      Defendants' view is unsupported by the statute's text and untenable as a matter of practice. Weighing an FOSC's substantial threat determination under the arbitrary and capricious standard and based on the evidence available at the time of the incident best follows the statutory mandate and implements Congress' purposes and intent. Thus, if this Court determines that *this* case warrants further discovery, the discovery allowed should be narrow and tailored to the specific needs of the

---

    [14]   *Compare, e.g.*, Ex. 16 at USCG_0028328 (logs) *with* Def. Ex. X (ECF 105-5) (same); *or* Ex. 16 at USCG_0028340 (NOFI) *with* Def. Ex. V (ECF 105-3) (same); *or* Ex. 16 at USCG_0028409 (investigating statement) *with* Def. Ex. R (ECF 104-7) (same).

    [15]   *Compare, e.g.*, Ex. 16 at USCG_0028380 (work assignment sheet directing response personnel to "deploy boom around the vessel" at 8:00am on Apr. 28, 2006) *with* Com Logs (ECF 69-6) at pp. 35/122 [USCG_0011118] (Noting a plan to "[d]eploy boom around vessel and nearby cays identified as sensitive sites the morning of 28APR06."); *or* Ex. 16 at USCG_0028392 (reporting soundings) *with* POLREPS (ECF 69-6) at pp. 17–21/122 [USCG_0006268–272] ("Vessel crew conducted soundings in all tanks and reported no loss of product.").

case. If, as Defendants suggest, "substantial modeling" is required and warring expert opinions must be evaluated before a substantial threat determination can be made (ECF 100 at 15), FOSCs will have to tread water awaiting approvals rather than diving in to handle an emergency.

The Government recognizes the record of the substantial threat determination here is thin. The responsible agencies have endeavored to address that through an assessment of the available record and the recorded recollections of those individuals charged with assessing the situation and making the determination in the first instance. And the Defendants have failed to come up with any existing document or discovery that is likely to create a genuine dispute as to any material fact. However, in the event this Court determines further discovery is warranted, the scope of available discovery should be tailored to the case and consistent with the dictates of the statute and regulations. *Accord* Fed. R. Civ. P. 26(b)(2)(C); *cf. In re Ferrell*, Case No. 15-10370, 2016 WL 1178439 at *3 (Bankr. D. Me. March 23, 2016) ("The Court may on its own initiative, limit discovery that is beyond the scope of permissible discovery."). For example, almost all of Defendants' outstanding questions could be addressed with a single deposition: that of FOSC Captain Tunstall. *See* Defs. 56(d) Motion (ECF 100) at 8; Defs. SOF (ECF 112-4) ¶¶ 25, 27, 28, 29, 30, 32, 33, 34, 35, 40, 41, 42, 43, 56, 62, 67, 68. Awarding such limited discovery would address the lack of a specific, contemporaneous decision document here, but would not expose the program to second-guessing in other cases or when facing future emergencies.

## II. The United States' Declarations And Documents Filed In Support Of Summary Judgement Are Properly Before The Court And Available For Its Consideration

Defendants' second motion concerning the record fairs even worse than their first. In their companion motion (ECF 101), Defendants aim to strike nearly all declarations and documents filed in support of the United States Motion for Partial Summary Judgement from this Court's consideration. The documents targeted by Defendants fall into three broad categories: (1) the declarations of retired Coast Guard Captains Tunstall (FOSC for the *Margara* incident) and Perry

and associated documents, (2) the declarations of administrative specialists Nance (NPFC) and

McLean (NOAA) authenticating agency records (and the attached records), and (3) the declaration

of NOAA scientist Kevin Kirsch. Principally, Defendants complain that these declarations and

documents post-date the *Margara* incident and should not be part of the Court's review in the event

it proceeds under an arbitrary and capricious standard.

First, the Captains' declarations are not strictly necessary here; the contemporaneous record

supports the FOSC's substantial threat determination and details the stages of the *Margara*'s rescue.

*See supra* at 2 (summarizing record); United States' MPSJ (ECF 69-1) at 18; NPFC Final Adjudication

(ECF 69-4) at p.15–20/271 (concluding the substantial threat element was satisfied). However, in a

desire to provide the Court with as much information as possible, the Government provided the

first-hand explanations of "administrative officials who participated in the decision" to facilitate this

Court's determination of "whether the decision was based on a consideration of the relevant factors

and whether there had been a clear error of judgment." *Cent. for Biological Diversity v. Bernhardt*, CV 19-

109-M-DLC, 2020 WL 1130365 * 2 (D. Mont. Mar. 9, 2020) (*discussing Citizens to Preserve Overton Park

v. Volpe*, 401 U.S. 402 (1971)). The Supreme Court in *Overton Park* "remanded to the district court to

review 'the full administrative record' including a consideration of contemporaneous <u>or</u>

<u>subsequently-generated documents</u> that shed light on the agency's decision-making process." *Id.*

(emphasis added). So, anticipating Defendants' complaint that the record lacked a contemporaneous

decision document from the FOSC, the Government provided them with precisely the information

they could have arguably demanded. Defendants' insinuation that the Captains' declarations are

"tailor-made" for the litigation is totally misplaced; they describe the decision-making process as it

unfolded; they explain and contextualize the record of contemporaneous documents that capture the

event (a record attached to the declarations); and they parallel the Captains' account of the decision

given to the NPFC—an account made years before any Party had issued a document hold to

custodians in anticipation of possible litigation. *See* MacLean Decl. (Ex. 1) ¶ 4; Parrish Declaration (ECF 112-6) ¶ 21.

The Defendants' reliance on *Department of Homeland Security v. Regents of the University of California*, 140 S. Ct. 1891, 1909 (2020), to reject the Coast Guard Captains' declarations is also misplaced. There, the Court refused to rely on legal memoranda written by a Cabinet Secretary that rescinded immigration policies written midstream during multidistrict litigation. *Id.* at 1901–04. Such a memo is hardly comparable to the declarations offered here, which were written by the agency actor and his deputy based on their personal knowledge of response actions that the FOSC was directed by law to assess and oversee. Indeed, other courts have looked to similar FOSC declarations when considering summary judgment motions regarding OPA liabilities. *E.g.*, *United States ex rel. Cal. Dep't of Fish & Wildlife v. HVI Cat Canyon, Inc.*, 314 F. Supp. 3d 1049, 1071 – 73 (C.D. Cal. 2018); *In re Settoon Towing*, 722 F. Supp. 2d 706, 709–10 (E.D. La. 2009); *United States v. Kilroy & Assocs., Inc.*, No. C08-1019-JCC, 2009 WL 3633891, at *5 (W.D. Wash. Oct. 30, 2009); *cf. United States v. Viking Res., Inc*, 607 F. Supp. 2d 808,825 (S.D. Tex. 2009) (rejecting Coast Guard affidavit submitted to prove scope of an agreed natural resource damages claim because it lacked certified copies of cost documents, as required by a prior version of Rule 56).

Next, the Nance and MacLean declarations certify the authenticity of Coast Guard and NOAA documents that relate to or consider the FOSC's substantial threat determination at issue in this case. These documents were garnered from the Agencies' Administrative Records on related decisions—the entirety of which have been provided to Defendants, and those portions pertinent to the United States' Motion for Partial Summary Judgment were provided for the Court's review. The documents were compiled in the ordinary course of the Agencies' business, reflect the Agency's decision-making, or document the Agency's actions as they occurred. *See* MacLean Decl. (Ex. 1) ¶ 6 & Nance Decl. (Ex. 7) ¶ 4. Neither the documents provided nor the declarations certifying them

pose a hearsay problem for this Court's consideration. *See* Fed. R. Ev. 803(6) (records of regularly conducted activities); 803(8) (public records); *see also Blue Mountain Biodiversity Project v. Jefferies*, No. 2:20-CV-02158-SU, 2021 WL 3683879 at *2 (D. Or. 2021) (discussing declaration of administrative professional certifying agency records and productions). To be sure, Rule 56(c) requires affiants and declarants to make statements "made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c). But custodians of public records, which are generally admissible under FRE 803(6) and (8), must only have "personal knowledge" of the custodial status, not first-hand knowledge of the actual events described in the documents. Under FRE 901(b)(7), public records that are "recorded or filed in a public office as authorized by law, or a purported public record or statement is from the office where items of this kind are kept" satisfies the authentication requirement of the Rule. "The fact of public custody may be established by testimony from the custodian of the public records . . . . The testimony of the person who created or signed the record is not necessary to establish public custody and may even be insufficient to do so." 31 Wright & Miller, Federal Practice & Procedure § 7112 (2d ed.) (citing *United States v. Cent. Gulf Lines, Inc.*, 575 F. Supp. 1430, 1433–34 (E.D. La. 1983)). *See also United States v. Lopez*, 762 F.3d 852, 863 (9th Cir. 2014) ("FRE 901 does not require personal knowledge of a document's creation, but rather only personal knowledge that a document was part of an official file.") (citation omitted).

Finally, Defendants misread the purpose of the Kirsch Declaration entirely. The Motion for Partial Summary Judgement considers *more* than the substantial threat determination; there are five elements to liability. *See* U.S. MPSJ (ECF 69-1) at 11, 23–24. Mr. Kirsch—an agency expert and an individual with personal experience of the scene of the Incident in the weeks following the Margara's rescue—testifies competently that the incident resulted in damages to natural resources, damages he saw for himself, alongside representatives of the Responsible Parties. Of course, the

scope of those damages is a matter for the remedy phase of this litigation—but the *fact* of the damage is an element to be established at liability, and Defendants provide no rebuttal to that fact, nor any reason that the Court cannot consider Mr. Kirsch's declaration based on his personal experience.

## CONCLUSION

In an effort to avoid the common-sense conclusion that their loaded, grounded oil tanker posed a substantial threat of discharge, Defendants' hope either to expand discovery to put the entire program on trial, or shrink the record of consideration to the vanishing point. Neither effort warrants consideration. Defendants' motions for discovery (ECF 100) and to strike record documents (ECF 101) should be denied.

January 27, 2023

Respectfully submitted,

TODD KIM
Assistant Attorney General
Environment and Natural Resources Division
United States Department of Justice

*s/ Elias L. Quinn*
ELIAS L. QUINN (G03503)
Senior Attorney
NATALIE G. HARRISON (G03504)
Trial Attorney
Environmental Enforcement Section
Environmental and Natural Resources Division
U.S. Department of Justice
P.O. Box 7611, Ben Franklin Station
Washington, DC 20044-7611
(202) 514-2756
Elias.Quinn@usdoj.gov
Natalie.G.Harrison@usdoj.gov

ATTORNEYS FOR UNITED STATES

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a copy of the above and foregoing has been electronically filed with the Clerk of Court via CM-ECF this 27th day of January 2023, which will provide service to counsel of record in this matter.

_s/ Elias L. Quinn_
ELIAS L. QUINN (G03503)
_Counsel for the United States_
