**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| United States of America,<br>Plaintiff<br>v.<br>Ernst Jacob and Shipowners<br>Insurance and Guaranty Company<br>Ltd.,<br>Defendants. | |
| Shipowners Insurance and Guaranty<br>Company, Ltd.,<br>Third-Party Plaintiff<br>v.<br>Margara Shipping Company, Ltd.<br>and Steamship Mutual Underwriting<br>Association, Ltd.,<br>Third-Party Defendants. | **Civil No. 21-1594(GMM)** |
| Ernst Jacob,<br>Third-Party Plaintiff<br>v.<br>Steamship Mutual Underwriting<br>Association, Ltd.,<br>Third-Party Defendant. | |
| Department of Natural and<br>Environmental Resources of the<br>Commonwealth of Puerto Rico,<br>Plaintiff-Intervenor<br>v.<br>Ernst Jacob and Shipowners<br>Insurance and Guaranty Company<br>Ltd.,<br>Defendants. | |

**OPINION AND ORDER**

Before the Court is Plaintiff's *Motion for Partial Summary Judgment* (Docket No. 69) and Defendant's corresponding *Joint Motion to Deny Premature Summary Judgement Motion* (Docket No. 100). For the reasons stated below, the Plaintiff's *Motion for Partial*

Civil No. 21-1594(GMM)
Page -2-

*Summary Judgment* is **GRANTED**, and the Defendant's *Joint Motion to Deny Premature Summary Judgement Motion* is **DENIED**.

## I.   RELEVANT FACTUAL AND PROCEDURAL BACKGROUND

A.   Relevant Factual Background

The parties do not dispute the facts that on April 27, 2006 at or around 12:30 a.m., a 748-foot double-hulled, ice strengthened tanker carrying over 300,000 barrels of No. 6 fuel oil — the *T/V Margara* — grounded in navigable waters in an area containing coral reefs off the coast of Tallaboa, Puerto Rico. (Docket Nos. 9 ¶¶ 35-37; 42 ¶¶ 1,38; and 39 ¶ 1).

The ship's Master subsequently activated its Vessel Response Plan and the U.S. Coast Guard's Sector San Juan was notified of the incident. (Docket Nos. 9 ¶¶ 39-41; 42 ¶¶ 39-40). The Coast Guard instructed the *T/V Margara* to cease all efforts to dislodge the vessel from the reef and dispatched its personnel and equipment to the grounding site. (Id.) The Coast Guard subsequently established a unified command post from which they could assess the grounding, develop recovery plans, and supervise the response efforts. (Id.)

After reviewing the situation, the Coast Guard's Federal On-Scene Coordinator ("FOSC") determined that the *T/V Margara* posed a substantial threat of discharging its oil into the surrounding navigable waters.

Civil No. 21-1594(GMM)
Page -3-

At 6:00 a.m. on April 27, 2006, the U.S. Coast Guard served the Master of *the T/V Margara* with a "Notice of Federal Interest For An Oil Spill Incident," form letter signed by the FOSC declaring that an oil pollution incident "occurred or threatens to occur." (Docket Nos. 9 ¶ 48; 69-4 at 52.)

B.   Relevant Procedural History

On December 9, 2021, Plaintiff, the United States of America ("the government"), filed a complaint against Ernst Jacob ("EJ") and Shipowners Insurance and Guaranty Company Ltd. ("SIGCo") seeking reimbursement and recovery of natural resource damages arising from the "significant threat" of an oil discharge emanating from the *T/V Margara* into navigable U.S. waters under Section 1002 of the Oil Pollution Act ("OPA"), 33 U.S.C. § 2702.

The government asked the Court to: (1) enter a declaratory judgement for the Plaintiff pursuant to Section 1017(f)(2) of the OPA for all uncompensated damages to natural resources arising out of the grounding of the *T/V Margara* including assessment costs and loss, loss of use, or injury to said natural resources; (2) enter a judgment against the Defendants for compensation paid by the Fund to Trustees for natural resource damages arising from the *T/V Margara* incident as well as all costs incurred by the Fund due to those claims including interest, attorney's fees, adjudicative, and administrative costs; (3) enter a judgement for the Plaintiff, on behalf of the National Oceanic and Atmospheric Administration

Civil No. 21-1594(GMM)
Page -4-

("NOAA"), for all natural resource damages assessed in the Trustee's Final Compensatory Restoration Plan and NOAA's incurred and uncompensated assessment costs; and (4) award any additional relief as the Court deems appropriate. (Docket No. 9 at 18).

On September 20, 2022, the parties held a Rule 26(f) case management conference to set out a plan for discovery and other pre-trial procedural matters. In accordance with this meeting, the parties submitted a *Notice of a proposal for a Joint Scheduling Plan* on October 4, 2022. (Docket No. 67). Notably, in this filing, the parties disagreed over the necessity of further fact discovery regarding the OPA liability determination.

In the October 4 Notice, Plaintiffs included their intention to file a *Motion for Partial Summary Judgment* on the matter of liability under the OPA, arguing that the "factual record was already thoroughly developed" and that the "sole remaining liability question [was] a matter committed to the discretion of the Coast Guard's On Scene Coordinator." (Docket No. 67 at 2). On October 7, 2022, the Plaintiffs filed the anticipated partial summary judgment motion requesting that the Court rule for them on the matter of whether the *T/V Margara*'s grounding constituted a "substantial threat" of an oil discharge into navigable waters, thus establishing that Defendants were liable pursuant to OPA. (Docket No. 69).

Civil No. 21-1594(GMM)
Page -5-

On December 12, 2022, Defendants filed a *Joint Motion to Deny Premature Summary Judgement Motion* contending that Plaintiff's summary judgement motion was premature given that there were open questions of fact regarding whether the *T/V Margara*'s grounding posed a "substantial threat" of an oil discharge. (Docket No. 100).

## II.  STANDARD OF REVIEW

### A.   The "Substantial Threat" Determination

OPA provides for the recovery of "damages for injury to, destruction of, loss of, or loss of use of, natural resources, including the reasonable costs of assessing the damage, which shall be recoverable by a United States trustee, a State trustee, an Indian tribe trustee, or a foreign trustee." 33 U.S.C. § 2702(b)(2)(A) (Supp. 1997). OPA defines natural resources as "include[ing] land, fish, wildlife, biota, air, water, ground water, drinking water supplies, and other such resources belonging to, managed by, held in trust by, appertaining to, or otherwise controlled by the United States (including the resources of the exclusive economic zone), any State or local government or Indian tribe, or any foreign government." 33 USC § 2701(20).

Section 1006(b) of OPA requires the President of the United States to designate federal officials who shall serve as representatives on behalf of the public as trustees of the natural resources protected by OPA. 33 U.S.C. § 2706(b)(2). In carrying out this duty, the President designated the Secretary of Commerce

Civil No. 21-1594(GMM)
Page -6-

as trustee for marine resources and related habitats. See 40 C.F.R. § 300.600(b)(1) (1997). NOAA, a scientific and regulatory agency within the United States Department of Commerce, was delegated the responsibility of administering OPA. 40 C.F.R. § 300.600.

OPA established the Oil Spill Liability Trust Fund ("OSLTF") which created an emergency fund to facilitate the expeditious removal and remediation of uncompensated damages arising from an OPA incident for up to $1 billion per incident. *See* 33 U.S.C. § 2752; *see also* U.S. COAST GUARD, NPFCPUB 16465.2, OIL SPILL LIABILITY TRUST FUNDING FOR OIL SPILLS 7 (2006). Section 7(c)(2) of Executive Order 12777 clearly delegated the United States Coast Guard the responsibility of administering the OSLTF. *See* Ex. Ord. No. 12777, Oct. 18, 1991, 56 C.F.R. § 54767 (stating that "[t]he functions vested in the President by Section 1013(e) of OPA, respecting the promulgation and amendment of regulations for the presentation, filing, processing, settlement, and adjudication of claims under OPA against the Trust Fund, are delegated to the Secretary of the Department in which the Coast Guard is operating. . ."). The Coast Guard in turn designated the National Pollution Funds Center ("NPFC"), the independent unit reporting to the Coast Guard Chief of Staff, with the responsibility for carrying out the OSLTF. *See* 33 C.F.R. Part 136. Thus, when a suspected OPA incident occurs, a predesignated Coast Guard FOSC is the administrative official tasked with determining

whether a potential "incident"[1] discharges or poses a "substantial threat" of discharging oil into navigable waters, triggering OPA jurisdiction. *See* 33 U.S.C. 2714(a), 40 C.F.R. §§ 300.120, 300.130(c).

FOSC's responsibilities are further described in federal rules and regulations stating that it is the role of the Coordinator to "(d) ensure the effective and immediate removal of a discharge and mitigation or prevention of a substantial threat of a discharge" by determining —. . .(2) "the discharge results in a substantial threat to the public health or welfare of the United States (including, but not limited to fish, shellfish, wildlife, other natural resources, and the public and private beaches and shorelines of the United States"; and, if it is, directing all Federal, State, and private actions to remove the discharge or to mitigate or prevent the threatened discharge." 40 C.F.R. part 300.305(d).

As such, it seems clear that the authority to make a "substantial threat" determination was clearly delegated to an agent of the United States, namely, a predesignated Coast Guard FOSC. Thus, this Court will review the challenged "substantial

---

[1] OPA defines an "incident" as "any occurrence or series of occurrences having the same origin, involving one or more vessels, facilities, or any combination thereof, resulting in the discharge or substantial threat of discharge of oil." 33 U.S.C. § 2701(14).

Civil No. 21-1594(GMM)
Page -8-

threat" determination as an agency action for the purpose of deciding whether summary judgment on the matter is appropriate.

B.    Arbitrary and Capricious and De Novo Review Standards Under APA Analysis of Informal Agency Actions

In making a "substantial threat" determination in response to an alleged OPA incident, the Coast Guard deploys its predesignated FOSCs to assess, direct, and coordinate incident response efforts. *See* 40 C.F.R. part 300.305(d). These FOSCs are instructed to follow the Department of Commerce's implementing regulations in carrying out the Natural Resource Damage Assessment program ("NRDA"). *See* 15 C.F.R. 990 et seq. (1997). Under the NOAA rule, administering parties must first undergo a pre-assessment of responding to an incident in which they are tasked with determining if they possess jurisdiction to pursue restoration under OPA. *See* 15 C.F.R. 990.40. Three conditions must be fulfilled for trustees to determine that they possess OPA jurisdiction:

(1)    an incident, as defined in the regulations, must have taken place;

(2)    the incident must not have been the result of a permitted discharge, the discharge from a public vessel; or a discharge from any on-shore facility covered by the Trans-Alaska Pipeline Authorization Act; and

(3)    that natural resources as defined by the act "may have been, or may be, injured as a result of the incident.

15 C.F.R. 990.41(a)(1)-(3). (Emphasis added).

Civil No. 21-1594(GMM)
Page -9-

The Coast Guard's Vessel Response Plan regulations define "substantial threat of such a discharge" as "any incident involving a vessel that may create a significant risk of discharge of cargo oil," including groundings. 33 C.F.R. § 155.1020. But in making the determination, FOSCs are instructed to undergo case-by-case fact intensive inquiry into whether a substantial threat exists. *See* NPFC Instruction M.7300. 1, Technical Operating Procedures for Determining Removal Costs Under the Oil Pollution Act of 1990.

To determine whether an incident poses a substantial threat of an oil discharge that might injure relevant natural resources, trustees including the FOSCs are asked to consider factors including:

> (1) The natural resources and services of concern; (2) The procedures available to evaluate and quantify injury, and associated time and cost requirements; (3) The evidence indicating exposure; (4) The pathway from the incident to the natural resource and/or service of concern; (5) The adverse change or impairment that constitutes injury; (6) The evidence indicating injury; (7) The mechanism by which injury occurred; (8) The potential degree, and spatial and temporal extent of the injury; (9) The potential natural recovery period; and (10) The kinds of primary and/or compensatory restoration actions that are feasible.

15 C.F.R. 990.51(e)(1-10). The NPFC operating manual further instructs FOSCs to consider whether the "situation presents an unacceptable probability that a discharge will occur without FOSC intervention," the potential for damage to environmentally sensitive or populous areas, and whether "action must be taken

quickly to prevent a spill." NATIONAL POLLUTION FUNDS CENTER (NPFC) Technical Operating Procedures for Determining Removal Costs under The Oil Pollution Act of 1990, Chpt. 7, 3-76 (1999).

C.    The Standard of Review for The Coast Guard FOSC's Action

    In Plaintiffs *Motion for Partial Summary Judgment* (Docket No. 69), the government posits that pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 551-559, the Court should apply the traditional agency law standard of "arbitrary and capricious review" to its analysis of the FOSC's "substantial threat" determination. Defendants in their counter *Motion for Denial of Partial Summary Judgment* disagree. They argue that agency actions only merit the more deferential arbitrary and capricious review when the court has been provided with the "whole" administrative record upon which it can apply the APA standard. (Docket No. 100). Defendants maintain that the government has failed to provide the Court with the full record and thus the FOSC's "substantial threat" determination should be reviewed *de novo*. They further contend that additional discovery on the "substantial threat" decision, upon which OPA liability turns, is essential for them to mount a sufficient defense on the matter that would allow the Court to undergo proper *de novo* review. The Court will first summarize the different proposed standards of review and then proceed to determine which standard is appropriate in the present circumstances.

Pursuant to section 706 of the APA, judicial review of an informal agency action considers whether the agency's decision was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A)(2012). The arbitrary and capricious standard of review is deferential to agency expertise and only disturbs an agency's determination when the agency considered impermissible information in making its decision or alternatively failed to consider an important factor in making that same determination. *See* Dep't of Homeland Sec. v. Regents of the Univ. of Cal., 140 S. Ct. 1891, 1896 (2020) (stating that "[u]nder this narrow standard of review, a court is not to substitute its judgment for that of the agency, but instead to assess only whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment."); *see also* Housatonic River Initiative v. United States EPA, 75 F.4th 248, 270 (*quoting* City of Taunton, Massachusetts v. United States Environmental Protection Agency, 895 F.3d 120, 126 (1st Cir. 2018) (emphasizing that "the 'scientific and technical nature of …[the agency's] decision making increases our level of deference.")) Thus, in determining whether a decision was arbitrary and capricious, the APA focuses on deciding whether the agency action was based on "unwarranted facts" or was otherwise "unsupported by substantial evidence." *See* 5 U.S.C. § 706 (2012)

(listing standards for holding agency action, findings, and conclusions unlawful).

In evaluating whether an agency acted in an arbitrary and capricious manner, the court must "review the whole record or those parts of it cited by a party." 5 U.S.C. § 706. The Supreme Court in the landmark case Citizens to Pres. Overton Park, Inc. v. Volpe understood the "whole" record as the "full administrative record" that was before the agency at the time that the decision was made. Overton Park, 401 U.S. 402, 420 (1971)(*abrogated on other grounds by* Califano v. Sanders, 430 U.S. 99(1977)). The administrative record thus, does not extend to litigation materials prepared afterward for judicial review. Id. at 419-20.

In cases where the Court lacks a sufficient administrative record to review an agency's decision under section 706 of APA, then the court then applies *de novo* review to the agency's action. However, the application of *de novo* review to agency actions is exceedingly rare and "[c]ourts require a strong showing of bad faith or improper behavior before ordering the supplementation of the administrative record." Instituto De Educacion Universal, Inc. v. United States Dep't of Educ., 341 F. Supp. 2d 74, 76 (D.P.R. 2004) (*quoting* Town of Norfolk v. U.S. Army Corps of Engineers, 968 F.2d 1438, 1458-59 (1st Cir. 1992); *see also* Charlton Memorial Hosp. v. Sullivan, 816 F. Supp. 50, 52 (D. Mass 1993) (stating that even in exceptional circumstances when statutes call for *de*

*novo* trial review of particular facts "it may be doubted that a district court is called upon to make 'findings' in a sense relevant to invoking Rule 56 (the rule governing the grant or denial of motions for summary judgement)."

Only in very rare cases is a court compelled to review an agency decision *de novo* due to an insufficient administrative record. When such cases arise, the Court undertakes its own factual review of the circumstances of a particular agency decision to determine whether the agency's conclusion was the correct one, rather than merely determining if the agency's conclusion was rationally based in accordance with the relevant facts. *See* <u>Orndorf v. Paul Revere Life Ins. Co.</u>, 404 F.3d 510, 518 (1st Cir. 2005) (noting that *de novo* agency action review tasks the court with analyzing "whether, upon a full review of the administrative record, the decision of the administrator was correct.")

As such, judicial review of informal agency actions centers around the question of whether an agency's conclusion was supported by the administrative record. *See* <u>Overton</u>, 401 U.S. at 416 (stating that in making such a determination, "the court must consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.").

Civil No. 21-1594(GMM)
Page -14-

### III. DISCUSSION

A.    Sufficiency of the Record Submitted

In their *Joint Motion to Deny Premature Summary Judgement Motion*, Defendants posit that the government failed to provide the Court with a full certified administrative record of the "substantial threat" determination. (Docket No. 100 at 2). They further argued that no copy of the "substantial threat" decision was given to the Court. (Id.) Without such a record, Defendants advance, the Court cannot properly review the FOSC's "substantial threat" determination under the APA's arbitrary and capricious standard of review. In light of this, Defendants request that the Court apply the more stringent *de novo* review and allow the parties time to undergo discovery so that defendants can collect evidence to effectively respond in opposition to Plaintiff's summary judgment motion pursuant to Federal Rule of Civil Procedure 56(d).[2] In sum, Defendant's motion to deny the government's summary judgment motion as premature turns on whether the administrative record provided to the Court was sufficient to constitute a "whole record" under the APA.

Defendants highlight that under U.S. Coast Guard policies, a FOSC is required to document his or her "substantial threat"

---

[2] See Fed. R. Civ. P. 56(d) allowing a court to deny a motion for summary judgement "[i]f a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition."

determination with an explanation of the reasons that he or she reached their conclusion. (Docket No. 103-3 at 17). Defendants contend that such a document was not shared as part of the administrative record. (Docket No. 100 at 8). Defendants also argue that other important documents were missing from the Plaintiff's provided evidentiary report, including records of trainings taken by the FOSC that qualified him to assess the incident and data produced by the reported depth soundings of the *T/V Margara*. (Id. at 10)

The Court acknowledges that the government could have been clearer in its record keeping and that the Coast Guard failed to include the final FOSC "substantial threat" determination in the exhibits that it has submitted to this Court. However, considering the Supreme Court's interpretation of "whole [administrative] record" in Overton, the pages upon pages of contemporaneous Coast Guard reports submitted in the government's *Motion for Partial Summary Judgement*, and the generally deferential review of informal expert agency decisions under the APA, the Court declines to find that this case constitutes one of the exceedingly rare circumstances in which it should undergo *de novo* review of the FOSC's administrative decision.

Arbitrary and capricious review of agency actions requires the reviewing court to consider either "the whole record or those parts of it cited by a party." 5 U.S.C. § 706. In Overton, the

Supreme Court established that arbitrary and capricious judicial review should interpret "whole [administrative] record" as the factual information that the agency had before it at the time that it made the challenged decision. Thus, in determining whether the FOSC in this case was justified in finding that the *T/V Margara*'s grounding posed a "substantial threat" of oil discharge, the Court considers the information at the FOSC's disposal at the time of the incident. Specifically, the relevant information for determining the sufficiency of the administrative record is limited to that at the FOSC's disposal between 12:30/33 am on April 27, 2006 when the *T/V Margara* grounded off the coast of Tallaboa, Puerto Rico and 6:00 am on the same date when the Coast Guard presented the vessel's master a "Notice of Federal Interest For An Oil Spill Incident." (Docket No. 9).

It should initially be addressed that the presence of a "substantial threat" of an oil discharge under OPA should not be evaluated based on the actual leakage of petroleum products into navigable waters. The fact that no oil spill resulted from the *T/V Margara*'s grounding is irrelevant to our inquiry here. The Court is tasked with determining, whether based on the information before him and considering the volume of the *T/V Margara*'s oil stores and the size and or character of the threat that a potential spill posed to the welfare of the United States, including its natural

resources, that "substantial threat" finding, and the corresponding responsive measures were justified.

Exhibits attached to the government's Motion for Partial Summary Judgment composing the "whole record" before the FOSC at the time he made his "substantial threat" determination included, among other things, Pollution Reports, Notification of FPN, Sector San Juan Incident Report, case report communication logs, a Notice of Federal Interest for an Oil Pollution Incident, and a Resources at Risk memo made at or near the time of the FOSC's decision. (Docket No. 69-4); *see also* (Docket No. 69-5). These documents recorded the first responders' analyses of the incident made during the critical 5.5 hours preceding the "substantial threat" determination. The reports included details on factors that FOSCs are required to consider in making their "substantial threat" determinations. *E.g.* "[t]he natural resources and services of concern; the mechanism by which the injury occurred; procedures available to evaluate and quantify injury; evidence indicating exposure; and pathways from the incident to the natural resource and/or services of concern; the potential degree, and spatial and temporal extent of the injury."

For instance, the Pollution Reports note that the *T/V Margara*, a vessel unmanned by a pilot and carrying over 300,000 barrels of # 6 oil, grounded AT POSN. 17° 57'N BY 066° 43.6'W. (Docket No. 9, 69-4 at 38). The report included the results of immediate incident

assessments indicating that evaluators had not identified any loss of oil from the *T/V Margara* nor had they found significant damage to the craft's hull. (Id.). The reports also noted that the vessel was "located in extremely environmentally sensitive south coast" in an area containing coral reefs. (Id. at 0011098-0011100). Moreover, the reports considered the present and predicted weather conditions and noted that the vessel was "slightly moving from port to starboard." (Id.).

The Resources at Risk memo made within 2 hours of the "substantial threat" determination was particularly clear in describing the relevant facts that the FOSC likely considered in making his OPA jurisdictional conclusion. This memo emphasized that Oil No. 6, the type of oil carried by the *T/V Margara*, was a heavy oil "[c]apable of forming stable emulsions or tarballs that are extremely difficult to clean up," possessed a tendency "to smother organisms that come in contact with it," and was fairly persistent with the ability to "may have severe impacts on waterfowl and diving birds." (Docket No. 69-4 at 132-135). Moreover, the memo noted that a discharge of oil from the *T/V Margara* would seriously harm shoreline resources including vulnerable coastal mangroves, sensitive tidal flat ecosystems, intertidal coral reefs, and a range of threatened and endangered species including Brown pelicans, West Indian Manatees, and multiple species of sea turtle. (Id.). In addition to the natural

systems damages that might arise from an oil spill from the *T/V Margara*, the memo also stressed that such a spill would also threaten local human-use resources including local fisheries, marine recreational sites, and recognized historical landmarks. (Id.).

The Court notes that the documents provided by the government, though admittedly not comprehensive, are an adequate representation of the information at the FOSC's disposal when he made the "substantial threat" determination. Past case law aligns with our determination. For example, in Norfolk v. United States EPA, 761 F. Supp. 867, 875 (D. Mass. 1991) the District Court found, and the First Circuit affirmed that "[t]o the extent that the [Plaintiffs] argue that the administrative record must also contain all documents on which [the state assessor] relied to create the documents on which [federal agency] relied, I must disagree. [The agency] has made a good-faith effort to collect every document on which it actually relied. . .and I am not prepared to ask for more." Moreover, under the APA, an agency's "designation of the Administrative Record. . .is entitled to a presumption of administrative regularity." Oceana, Inc. v. Ross, 920 F.3d 855, 865 (D.C. Cir. 2019). Defendants have failed to present evidence sufficient to overcome the presumption of administrative regularity. Thus, the Court finds that the Plaintiff's submitted evidence is sufficient to constitute a

"whole record" subject to arbitrary and capricious review under the APA on the issue of OPA liability.

Arbitrary and capricious review under the APA is limited to the administrative record. As such, the Defendant's invocation of Rule 56(d) requesting a denial of Plaintiff's *Motion for Partial Summary Judgement* is inappropriate given that additional discovery on the "substantial threat" determination would not uncover any evidence that the Court would even consider in reviewing the FOSC's agency action. Thus, the Court rejects Defendant's argument that it should deny the partial summary judgement of grounds of insufficient time for discovery that would allow Defendants to effectively oppose Plaintiff's motion.

B.    <u>Arbitrary and Capricious Review of the FOSC's Determination</u>

The standard for making a substantial threat determination under OPA is that the FOSC finds a notable risk that "natural resources may be, injured as a result of the incident. 16 C.F.R. 990.41(a)(3) and that the "situation presents an unacceptable probability that a discharge will occur without FOSC intervention," the potential for damage to environmentally sensitive or populous areas, and whether "action must be taken quickly to prevent a spill." NATIONAL POLLUTION FUNDS CENTER (NPFC) Technical Operating Procedures for Determining Removal Costs under The Oil Pollution Act of 1990, Chpt. 7, 3-76 (1999).

Due to the precarious circumstances of a vessel full of large quantities of oil resting in an ecologically sensitive location, first responders including the Coast Guard proceeded with extreme caution by conducting repeated soundings and analyses of the craft, establishing an emergency safety zone, and deploying emergency tugs and booms to stabilize the craft to help mitigate discharge risks. (Docket No. 69-4 at 38-40); *see also* similar reports from the Sector San Juan Incident Report (Id. at 47) made at 1:25 am on April 27, 2006 and (Id. at 44) regarding the status of the T/V Margara (noting that there had been a "FOSC DETERMINATION OF SUBSTANTIAL THREAT" described as a "VESSEL GOUDING IN TALLABOA, RP" with an estimated potential quantity of oil that could be discharged into navigable waters of "1000 Barrels.").

Drawing on the contemporaneous reports and risk analyses provided to emergency responders in the early morning hours of April 27, 2006, Kevin Kirsch, the former Regional Resource Coordinator overseeing the response to the T/V Margara incident, stated that "based on all of the information noted above, my concerns included the large volume of oil which could have been released, the persistent nature of that type of oil, the limited response and clean-up resources available on the south side of Puerto Rico, the sensitive nature of the natural resources in the area, potential structural failure of the ship, and the challenging nature of an over-the-side shallow water fuel transfer." (Docket

**Civil No. 21-1594(GMM)**
**Page -22-**

No. 69-5 at 3). Given this interpretation of available data provided in the documents submitted to this Court, the FOSC's "substantial threat" determination does not appear to be arbitrary nor capricious.

### V. CONCLUSION

For the reasons stated above, Plaintiff's *Motion for Partial Summary Judgement* is **GRANTED**, and Defendant's *Joint Motion to Deny Premature Summary Judgement Motion* is **DENIED**.

IT IS SO ORDERED.

In San Juan, Puerto Rico, September 7, 2023.

s/Gina R. Méndez-Miró
GINA R. MÉNDEZ-MIRÓ
UNITED STATES DISTRICT JUDGE