**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF PUERTO RICO**

| | |
|---|---|
| United States of America, Plaintiff v. Ernst Jacob and Shipowners Insurance and Guaranty Company Ltd., Defendants. | |
| Shipowners Insurance and Guaranty Company, Ltd., Third-Party Plaintiff v. Margara Shipping Company, Ltd. and Steamship Mutual Underwriting Association, Ltd., Third-Party Defendants. | **Civil No. 21-1594(GMM)** |
| Ernst Jacob, Third-Party Plaintiff v. Steamship Mutual Underwriting Association, Ltd., Third-Party Defendant. | |
| Department of Natural and Environmental Resources of the Commonwealth of Puerto Rico, Plaintiff-Intervenor v. Ernst Jacob and Shipowners Insurance and Guaranty Company Ltd., Defendants. | |

**OPINION AND ORDER**

Before the Court is the Third-Party Defendant's *Steamship Mutual Underwriting Association Limited's Motion for an Order Compelling Arbitration and Stay of the Third-Party Complaint of Shipowners Insurance and Guaranty Company, Ltd And Memorandum of*

Civil No. 21-1594(GMM)
Page -2-

*Law in Support Thereof* ("Steamship's *Motions to Compel Arbitration and Motion to Stay*")(Docket No. 87) and Third-Party Plaintiff Shipowners Insurance and Guaranty Company, Ltd.'s ("SIGCo") *Motion for Oral Argument on the Motion to Compel Arbitration.* ("SIGCo's *Motion for Oral Argument*")(Docket No. 132). For the reasons stated below, Steamship's *Motion to Compel Arbitration* and *Motion to Stay* are **GRANTED** and SIGCo's *Motion for Oral Argument* is rendered **MOOT**.

## I.  RELEVANT FACTUAL BACKGROUND

A.   The grounding of the *T/V Margara*

On April 27, 2006, a 748-foot double-hulled, ice strengthened tanker carrying approximately 315,693 barrels of No. 6 fuel oil — the *T/V Margara* — grounded approximately three miles off the coast of Tallaboa, Puerto Rico. (Docket Nos. 9 ¶¶ 35-37; 42 ¶¶ 1,38; and 39 ¶ 1).

At 6:00 a.m. on April 27, 2006, the U.S. Coast Guard served the Master of *the T/V Margara* with a "Notice of Federal interest For An Oil Spill Incident," form letter signed by the Federal On-Scene Coordinator ("FOSC") declaring that an oil pollution incident "occurred or threatens to occur." (Docket Nos. 9 ¶ 48; 69-4 at 52). This determination triggered the initiation of assessment, response, and remediation efforts to mitigate damages caused by the incident in accordance with the Oil Pollution Act of 1990 ("OPA"). (Id.); 33 U.S.C. §§ 2701-2761 (1990). In the decade following the *T/V Margara*'s grounding, the government's trustees

Civil No. 21-1594(GMM)
Page -3-

at the National Oceanic and Atmospheric Administration ("NOAA") and the Puerto Rico Department of Natural Resources ("DNER") (collectively "Trustees") assessed natural resource damages and undertook restoration actions to revitalize the damaged environment. (Docket Nos. 9 ¶¶ 56, 59-60, 62-66).

B.    <u>Parties to the Dispute</u>

At the time of the grounding event, Third-Party Defendant, Margara Shipping Company Ltd. ("Margara") owned the *T/V Margara*; Defendant Ernst Jacob ("EJ") was the operator of the *T/V Margara*; Defendant and Third-Party Plaintiff SIGCo was the guarantor of Margara; and Third-Party Defendant Steamship provided the *T/V Margara*, Margara, and EJ with Protection and Indemnity insurance. (Docket Nos. 9 ¶¶ 31-34).

Margara is a shipping company organized in the Cayman Islands and headquartered in Germany. (Docket No. 53 ¶ 2). Margara was the registered owner of the *T/V Margara* in April 2006, the time of the ship's grounding. (<u>Id.</u>)

EJ is a company engaged in the primary business of contracting with and providing technical ship operation to vessel owners. (Docket No. 52 at 3). EJ is incorporated and headquartered in Hamburg, Germany. (Docket No. 87 at 12.) At the time of the *T/V Margara*'s grounding, EJ was the operator of the ship. (<u>Id.</u>).

SIGCo is a company whose primary business is the provision of financial guarantees for "responsible parties" for vessels

Civil No. 21-1594(GMM)
Page -4-

crossing U.S. navigable waters subject to OPA. (Docket No. 87 at 11.) It is headquartered and incorporated in Bermuda. (Id.) On November 13, 2003, SIGCo and Margara entered a Financial Responsibility Guaranty Contract ("COFR Guaranty") which provided Margara with the Certificate of Financial Responsibility ("COFR") required under OPA to navigate in U.S. waters. (Docket No. 53 at 6).

Clause 1 of the COFR Guaranty between SIGCo and Margara required that Margara possess protection and indemnity coverage "for full protection and indemnity risks as defined in and subject to the terms and conditions of the rules of the Club under law including, but not limited to, OPA 1990 and CERCLA in no less than the Standard Amount."[1] (Id. ¶ 10). Margara did so with Steamship prior to applying for the COFR with SIGCo. (Id. ¶ 11). The COFR Guaranty agreement was in place in April of 2006 and thus, SIGCo was the guarantor of the T/V Margara at the time of the ship's grounding. (Docket No. 53 at 6).

Steamship is a Protection and Indemnity Association made up of member shipowners who collectively provide enrolled members with certain marine insurance. (Docket Nos. 53 ¶ 3; 87 at 12). It is organized and headquartered in the United Kingdom. (Docket No. 87 at 12). At the time of the 2006 grounding event, both EJ and

---

[1] At the time of the grounding of the Margara, the "standard amount" was approximately 500 million dollars. (Docket No. 53 ¶ 10).

Civil No. 21-1594(GMM)
Page -5-

Margara were members of Steamship and the *T/V Margara* was listed as a vessel covered by Steamship's Protection and Indemnity Insurance Policy for Policy year 2006-2007 ("P&I Policy" or "Policy"). (Docket No. 53 ¶ 3).[2]

C.   <u>Steamship's P&I Policy</u>

At the time of the *T/V Margara*'s grounding, Steamship's protection and indemnity coverage was subject to the terms and conditions laid out in Steamship's P&I Rules for policy year 2006-2007. In the relevant parts, Rule 25vi of Steamship's P&I Policy Rules for 2006-2007 protects and indemnifies Steamship members against:

> Liabilities, losses, damages, costs and expenses caused by or consequent on the escape or discharge or threatened escape or discharge of oil or any other substance from the entered ship . . . Costs of any measures reasonably taken for the purpose of avoiding, minimising or cleaning up any pollution, any imminent danger of pollution, or any resulting loss, damage or contamination, together with any liability for any loss of or damage to property caused by any measures so taken. . .provided always that. . .such liabilities, costs or expenses are not recoverable under the Hull Policies of the entered ship. . .

(Docket No. 87-3 at 50).

---

[2] On February 28, 2006, Steamship provided a Certificate of Entry to Margara Shipping establishing that the *T/V Margara* was entered with Steamship from February 20, 2006 until February 20, 2007, "in accordance with the Rules, to the extent specified and in accordance with the Act, By-Laws and the Rules from time to time in force…." (Docket No. 87-2 at 1). The Certificate of Entry further referred to Steamship's Rules as governing the terms of "entry," and noted that the "Rules are printed annually in book form. . ." (<u>Id.</u>).

Civil No. 21-1594(GMM)
Page -6-

Rule 47 of Steamship's P&I Policy Rules for 2006-2007 provides:

> In the event of any difference or dispute
> whatsoever, between or affecting a Member and the
> Club and concerning the insurance afforded by the
> Club under these rules or any amounts due from the
> Club to the Member or the Member to the Club, such
> difference or dispute shall in the first instance
> be referred to adjudication by the Directors. . .
> If the Member does not accept the decision of the
> Directors, or if the Managers, in their absolute
> discretion, so decide, the difference or dispute
> shall be referred to the arbitration of three
> arbitrators, one to be appointed by each of the
> parties and the third by the two arbitrators so
> chosen, in London. The submission to arbitration
> and all the proceedings therein shall be subject to
> the provisions of the English Arbitration Act 1996
> and the schedules thereto or any statutory
> modifications or re-enactment thereof . . . These
> rules and any contract of insurance between the
> Club and the Member shall be governed by and
> construed in accordance with English law.

(Id. at 82).

## II.     PROCEDURAL HISTORY

Pursuant to the *T/V Margara*'s COFR, Trustees seek reimbursement for recovery of natural resource damages, associated administrative costs, and anticipated costs of compensatory restoration from SIGCo. (Docket No. 9 at 2).

On August 30, 2022, SIGCo filed a Third-Party Complaint against Margara and Steamship (Docket No. 53), alleging among other things that: (1) SIGCo is entitled to recover from Steamship, Margara's insurer, for any claims SIGCo must pay to the United States, since its COFR Guaranty was dependent upon such coverage by the P&I Policy (Count II); (2) under 26 P.R. Laws § 2003,

Civil No. 21-1594(GMM)
Page -7-

Steamship, as Margara's insurer, is directly and fully liable for any liabilities that Margara owes under OPA, including those owed to SIGCo (Count IV); and (3) SIGCo is entitled to contribution for damages from EJ and Margara — and Steamship as their insurer — for any OPA liabilities that SIGCo is required to pay.(Docket No. 53 at 7-11).

On November 25, 2022, Steamship responded to SIGCo's complaint arguing, among others, and without submitting to this Court's jurisdiction, that the Court lacked personal jurisdiction over it and that SIGCo had no right or cause of action against it, direct or otherwise. (Docket No. 86 at 5).

On that same day, Steamship filed its *Motion to Compel Arbitration and Motion to Stay*. (Docket No. 87). Steamship contends, again without submitting itself to this Court's jurisdiction, that the P&I Policy upon which SIGCo bases its direct-action suit requires that any dispute related to Steamship's insurance coverage be submitted to arbitration in London, UK. (Id. at 2).

On January 20, 2023, SIGCo filed a response to Steamship's motion. (Docket No. 121). SIGCo argues that since it was not a party to the P&I Policy and it did not agree to the arbitration term contained therein, it is not bound to arbitrate under the contract. (Id. at 8). SIGCo also posits that the Puerto Rican direct-action statute functions to nullify Steamship's arbitration

Civil No. 21-1594(GMM)
Page -8-

clause since the statute itself states that such claims "may only be exercised in Puerto Rico." (Id. at 21). SIGCo further notes that, pursuant to the federal McCarran Ferguson Act ("MFA"), laws (including anti-arbitration statutes) regulating the "business of insurance" are not preempted by conflicting federal statutes including the FAA and thus the Puerto Rican Insurance Code controls the dispute. (Id. at 23).

Steamship filed a reply to SIGCo's response on February 6, 2023. (Docket No. 131). Therein, Steamship argues that contrary to SIGCo's claims, SIGCo relied on and knowingly benefited from the P&I Policy by: (1) invoking the Policy to bring its direct-action claim and (2) issuing its COFR Guaranty to Margara with knowledge of and because of the Policy. (Docket No. 131 at 7-9). Steamship also alleges that SIGCo failed to cite caselaw demonstrating that the existence of a valid direct-action statute claim in Puerto Rico precludes the initiation of insurance proceedings outside of the Commonwealth. (Id. at 9).

Finally, on February 13, 2023, SIGCo filed a *Motion for Oral Argument*. (Docket No. 132). SIGCo requests the Court grant its motion and compel oral argument on whether the granting of arbitration proceedings with Steamship should be governed by the terms of the direct-action provision in the Puerto Rico Insurance Code. (Id. at 2). Specifically, SIGCo seeks oral argument on meaning of the direct-action statute phrase, "The direct-action

Civil No. 21-1594(GMM)
Page -9-

against the insurer may only be exercised in Puerto Rico." *See* 26 P.R. Laws § 2003; (Id. at 3).

Before the Court now are Steamship's *Motions to Compel Arbitration* and *Motion to Stay* and SIGCo's *Motion for Oral Argument*. The Court will focus its analysis on Steamship's Motion to Compel Arbitration given that the other motions rest on the resolution of that matter.

### III.    LEGAL STANDARD

There is a general preference for arbitration under Puerto Rico and Federal Law, as well as the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, June 10, 1958, 21 U.S.T. 2517, 330 U.N.T.S. 3 ("New York Convention"). *See* 32 P.R. Laws Ann. § 3201; Federal Arbitration Act, 9 U.S.C. §§ 1 *et seq.;* 21 U.S.T. 2519; *See also* Allied-Bruce Terminix Cos., Inc. v. Dobson, 513 U.S. 265 (1995); Quiñones-González v. Asoc. Cond. Playa Azul II, 161 D.P.R. 668 (2004). However, that preference is limited by the requirement that an arbitration contract is valid and enforceable. *See* 32 P.R. Laws Ann. § 3201; 9 U.S.C. § 2; 21 U.S.T. 2519. Thus, in determining whether the Court should grant Steamship's Motion to Compel Arbitration, the Court first considers whether the P&I Policy is arbitrable.

In granting a motion to compel arbitration, the First Circuit establishes four requirements: (1) a valid arbitration agreement; (2) the movant's authority to invoke the arbitration clause; (3)

Civil No. 21-1594(GMM)
Page -10-

the arbitration clause's binding effect on the nonmovant; and (4) the claim's falling within the scope of the arbitration clause. *See* InterGen N.V. v. Grina, 344 F.3d 134, 142 (1st Cir. 2003). The burden on establishing these requirements is placed on the moving party. *See* Air-Con, Inc. v. Daikin Applied Latin Am., LLC, 21 F.4th 168, 173 (1st Cir. 2021) (*quoting* Soto-Fonalledas v. Ritz-Carlton San Juan Hotel Spa & Casino, 640 F.3d 471, 474 (1st Cir. 2011)) ("Our precedent makes clear that the party seeking to compel arbitration bears the burden of proving "that a valid agreement to arbitrate exists."). *See also* Rivera-Colón v. AT&T Mobility P.R., Inc., 913 F.3d 200, 207 (1st Cir. 2019); Dialysis Access Ctr., LLC v. RMS Lifeline, Inc., 638 F.3d 367, 375 (1st Cir. 2011); Cullinane v. Uber Techs., Inc., 893 F.3d 53, 60 (1st Cir. 2018).

## IV.    RELEVANT LAWS

A.   OPA

OPA provides a comprehensive liability scheme governing the discharge of petroleum products into navigable waters of the United States. *See* 33 U.S.C. §§ 2701-2761. Under OPA, owners, operators, and charterers of a vessel that have discharged or caused a substantial threat of a discharge of oil into navigable waters are deemed "responsible parties" that are strictly liable for resulting removal costs and damages as outlined in section 2702(b). *See* 33 U.S.C. §§ 2702(a), 2701(14). As an alternative to recovering damages from a responsible party under OPA, damages can

Civil No. 21-1594(GMM)
Page -11-

be recovered from a responsible party's guarantor. *See* 33 U.S.C. § 2716(f)(1). Pursuant to 33 U.S.C. § 2701(13), a guarantor is "any person, other than the responsible party, who provides evidence of financial responsibility for a responsible party under" OPA.

B.   The Puerto Rico Direct-Action Statute

The Puerto Rico Insurance Code allows injured persons to bring direct-actions in Puerto Rico against the insurers of alleged tortfeasors in accordance with the terms and limitations of the tortfeasor's insurance policy. *See* 26 P.R. Laws Ann. §§ 2001, 2003; García-Navarro v. Hogar La Bella Unión, Inc., Civil No. 17-01271 (JAW) 2020 U.S. Dist. LEXIS 224117, at *44 (D.P.R. Nov. 30, 2020). Specifically, in the relevant part, the Insurance Code states:

> Any individual sustaining damages and losses shall have, at his option, a direct-action against the insurer under the terms and limitations of the policy, which action he may exercise against the insurer only or against the insurer and the insured jointly. The direct-action against the insurer may only be exercised in Puerto Rico. The liability of the insurer shall not exceed that provided for in the policy, and the court shall determine not only the liability of the insurer, but also the amount of the loss. Any action brought under this section shall be subject to the conditions of the policy or contract and to the defenses that may be pleaded by the insurer to the direct-action instituted by the insured.

26 P.R. Laws Ann. § 2003.

This District Court has previously stated that "[t]he language of the direct-action statute largely speaks for itself. As long as the suit is pursued in Puerto Rico, "any individual" who properly claims "damages and losses" may bring such action

Civil No. 21-1594(GMM)
Page -12-

directly against the insured, the insurer, or both jointly." Reifer-Mapp v. 7 Maris, Inc., 830 F.Supp 72, 75 (D.P.R. 1993). Moreover, this Court held that the statute applies to marine insurance policies stressing that "nowhere in the statutory section containing the direct-action remedy in Puerto Rico are there exceptions or special considerations involving any particular type of insurance policy or company." Id.

C.   The New York Convention

The New York Convention's treaty governs international arbitration. In September 1970, the United States acceded to the treaty and the Convention entered into force soon thereafter. See New York Convention Act § 4; 21 U.S.T. 2517. The purpose of the New York Convention is to "encourage the recognition and enforcement of commercial arbitration agreements in international contracts and to unify the standards by which agreements to arbitrate are observed and arbitral awards are enforced in the signatory countries." Scherk v. Alberto Culver Co., 417 U.S. 506, 520 (1974).

"An action or proceeding falling under the Convention shall be deemed to arise under the Constitution, laws or treaties of the United States." Ledee v. Ceramiche Ragno, 528 F.Supp. 243, 245 (D.P.R. 1981), aff'd, 684 F.2d 184 (1st Cir. 1982) (quoting 9 U.S.C. § 203). As such, the New York Convention is "supreme law" and has a preemptive effect over state law. See Green Enters., LLC

v. Dual Corp. Risks Ltd., Civil No. 20-1243 (JAG), 2021 U.S. Dist. LEXIS 112989, at *13 (D.P.R. June 15, 2021); Filanto S.p.A. v. Chilewich Intern. Corp., 789 F.Supp. 1229, 1236 (S.D.N.Y. 1992), aff'd, 984 F.2d 58 (2d Cir. 1993) (the New York Convention, as a treaty, "is the supreme law of the land, U.S. Const. Article VI Cl.2, and controls any case in any American court falling within its sphere of application.").

Moreover, as held in Green Enters., LLC, the New York Convention, unlike the Federal Arbitration Act, is not subject to the reverse-preemption effect of the MFA. Green Enters., LLC, 2021 US. Dist. LEXIS 112989, at *13. The MFA establishes that "[n]o Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance, or which imposes a fee or tax upon such business, unless such Act specifically relates to the business of insurance." 15 U.S.C. § 1012(b). In Green Enters, LLC, this District concluded that the New York Convention preempted the Puerto Rico Insurance Code since it was self-executing. Green Enters., LLC, U.S. Dist. LEXIS 112989 at 12-13. The Convention was thus not considered an "Act of Congress" like the FAA, and the MFA did not function to limit international arbitration. Id. As such, this District held that in ratifying the Convention, "the federal government established a uniform policy favoring enforcement of international arbitration agreements even when "a contrary result

Civil No. 21-1594(GMM)
Page -14-

would be forthcoming in a domestic context."" Id. at *18; *see also* Green Enters., LLC v. Hiscox Syndicates Ltd., 68 F.4th 662, 667 (1ˢᵗ Cir. 2023) (*quoting* CLMS Mgmt. Servs. Ltd. P'ship v. Amwins Brokerage of Ga., LLC, 8 F.4th 1007, 1013 (9th Cir. 2021)) (stating that Article II(3) of the Convention "is addressed directly to domestic courts, mandates that domestic courts 'shall' enforce arbitration agreements, and 'leaves no discretion to the political branches of the federal government whether to make enforceable the agreement-enforcing rule it prescribes.'"); 21 U.S.T. 2519.

Article II(1) of the New York Convention provides that "[e]ach Contracting State shall recognize an agreement in writing under which the parties undertake to submit to arbitration all or any differences which have arisen or which may arise between them in respect of a defined legal relationship, whether contractual or not, concerning a subject matter capable of settlement by arbitration." 21 U.S.T. 2519. Article II(3) goes on to state that "[t]he court of a Contracting State, when seized of an action in a matter in respect of which the parties have made an agreement within the meaning of this article, shall, at the request of one of the parties, refer the parties to arbitration, unless it finds that the said agreement is null and void, inoperative or incapable of being performed." Id. In short, if applicable, the Convention requires this Court to grant a motion to compel arbitration if: (1) the contract in dispute "falls under the convention"; and (2)

Civil No. 21-1594(GMM)
Page -15-

the contract is not "null and void, inoperative or incapable of being performed."

The First circuit considers four factors in determining whether a dispute "falls under the Convention": (1) the existence of a written arbitration agreement; (2) whether it provides for arbitration in the territory that is a signatory to the Convention; (3) whether it arises out of a commercial relationship; and (4) whether a party to the agreement is not an American citizen, or whether the commercial relationship from which the agreement arises has some reasonable relation with a foreign state. *See* DiMercurio v. Sphere Drake Ins., PLC, 202 F.3d 71, 74 (1st Cir. 2000); Eazy Elecs. & Tech., LLC v. LG Elecs., Inc., 226 F. Supp. 3d 68, 73-74 (D.P.R. 2016).

Finally, in the 2020 case, GE Energy Power Conversion Fr. SAS, Corp. v. Outokumpu Stainless USA, LLC, 140 S. Ct. 1637 (2020), the Supreme Court unanimously held that state-law equitable estoppel doctrine did not conflict with the New York Convention and allowed for the enforcement of an arbitration agreement by a non-signatory party. Critically, in his majority opinion, Justice Thomas noted that since the New York Convention "does not address whether non-signatories may enforce arbitration agreements under domestic doctrines such as equitable estoppel[,]" "the provisions of Article II contemplate the use of domestic doctrines to fill gaps in the Convention." Id. at 1645. The Majority went on to

Civil No. 21-1594(GMM)
Page -16-

highlight that Article II of the New York Convention "address[es]
the recognition of arbitration agreements, not who is bound by a
recognized agreement." Id. at 1648.

## V. DISCUSSION

A.    The applicability of the New York Convention to the P&I Policy

Before examining the arbitrability of SIGCo's claims, the
Court must determine whether the P&I Policy is subject to the New
York Convention. Steamship argues that in applying the First
Circuit's four factor test, there is no question that the P&I
Policy falls under the New York Convention. The Court concurs that
the factors necessary to trigger the New York Convention are met.

First, Steamship's Certificate of Entry in conjunction with
Steamship's Rules are sufficient to constitute a written
arbitration agreement. *See* Fisser v. International Bank, 282 F.2d
231, 232 (2d Cir. 1960) (*citing* 9 U.S.C.S. §§ 2,4) ("A written
provision in any maritime transaction to settle by arbitration a
controversy thereafter arising out of such transaction is the *sine
qua non* of an enforceable arbitration agreement."). Second, Rule
47 of Steamship's P&I Policy Rules for 2006-2007 designates London,
as the location for arbitration, which falls within the territory
of the United Kingdom, a signatory of the New York Convention. *See*
Kronlage Fam. Ltd. P'ship v. Indep. Specialty Ins. Co., Civil No.
22-1013, 2023 WL 246847 (E.D. La. Jan. 18, 2023) (noting that the

Civil No. 21-1594(GMM)
Page -17-

United Kingdom and the United States are both signatories of the New York Convention). _Third_, the P&I Policy and its rules arise out of a commercial legal relationship. _See_ _Gulledge v. Certain Underwriters at Lloyd's, London_, Civil No. 18-6657, 2018 WL 4627387, at *2 (E.D. La. Sept. 27, 2018) ("The agreement arises out of Defendant's insurance policy, a commercial legal relationship. . .")._Fourth_, the parties to the contract, Margara and Steamship are both foreign corporations with their headquarters and primary places of business outside of the United States. (Docket Nos. 9 ¶¶ 31-34; 53 ¶ 3; and 86 ¶ 3). Based on the foregoing, the Court concurs with Steamship that the P&I Policy falls under the New York Convention.

Having determined that the New York Convention applies to the Policy, the Court must next consider whether the Policy is "null and void, inoperative or incapable of being performed" to determine if the Convention governs the present dispute. 21 U.S.T. 2519. If the Court finds that the Policy is valid, then the New York Convention, as supreme law, supersedes the Puerto Rican Insurance Code, particularly the term requiring that a direct-action be exercised in Puerto Rico. In evaluating the validity of the Policy's arbitration agreement, the Court must analyze the arbitrability of the P&I Policy as applied to SIGCo.

Civil No. 21-1594(GMM)
Page -18-

B.   <u>Arbitrability</u>

In considering Steamship's *Motion to Compel Arbitration*, the Court finds that there is no question that the first two prongs of the First Circuit's arbitrability test are met. Neither party disputes that the P&I Policy between Steamship and Margara contained a clear and valid arbitration term. Moreover, it is evident that as a signatory to the P&I Policy, Steamship, the moving party, has the authority to invoke the contract's arbitration term. *See* <u>Cooper Tire & Rubber Co. v. Premium Tire & Parts Corp.</u>, Civil No. 17-2085 (DRD), 2018 U.S. Dist. LEXIS 104192, at *10 (D.P.R. June 18, 2018) (*citing* <u>Torres-Rosario v. Marriott Int'l</u>, 872 F.Supp.2d 149, 153 (D.P.R. 2012) (stating that this prong of the First Circuit's test is satisfied when the moving party is a party or signatory to the agreement possessing the arbitration provision). Controversy between the Steamship and SIGCo arises over the final two prongs of the First Circuit's test: whether the non-moving party is bound by the arbitration agreement and if the claims being brought fall within the scope of that agreement.

1.   <u>SIGCo as a non-signatory party</u>

Steamship argues that SIGCo can be bound to the P&I Policy's arbitration provision, even when it did not sign the Policy. (Docket No. 87 at 17). Invoking the doctrine of direct benefit equitable estoppel, Steamship contends that SIGCo's direct-action

Civil No. 21-1594(GMM)
Page -19-

suit relies on the exact contract that's arbitration term SIGCo seeks to avoid. (Id.). As such, SIGCo should be required to adhere to arbitration term of the Policy. (Id.). SIGCo rebuts this claim arguing that as a non-signatory to the P&I Policy, it did not consent to the Contract's arbitration term and thus cannot be bound by it under federal admiralty law, Puerto Rico law, or the New York Convention. (Docket No. 121 at 10-11). Thus, the Court must consider whether the doctrine of equitable estoppel functions to bind SIGCo despite its status as a non-signatory. To do so, it must first determine which law governs the question of whether a non-signatory is bound by the provisions of a contract.

In GE Energy Power Conversion France SAS, Corp., the Supreme Court unanimously held that domestic equitable estoppel doctrines can apply to agreements falling under the New York Convention when the Convention is silent on an issue. *See* GE Energy Power Conversion France SAS, Corp., 140 S. Ct. at 1645 (stating that "Far from displacing domestic law, the provisions of Article II contemplate the use of domestic doctrines to fill gaps in the Convention.") The Court indicated that similar to its earlier determination in Arthur Andersen LLP v. Carlisle, 556 U.S. 624, 630, (2009) regarding the Federal Arbitration Act, the application of the Convention does not "alter background principles of state contract law regarding the scope of agreements (including the question of who is bound by them)." GE Energy Power Conversion

Civil No. 21-1594(GMM)
Page -20-

_France SAS, Corp._, 140 S. Ct. at 1640 (_citing_ Arthur Andersen LLP, 556 U.S. at 630); _see also_ Gonzalez v. UBS Fin. Servs., Inc., Civil No. 19-01086 (WGY), 2023 WL 3952983, at *1 (D.P.R. June 12, 2023) (stating that "arbitration is viewed under federal law as a creature of state-law consent. . ."). In light of the Supreme Court's ruling in GE Energy Power Conversion France SAS, Corp., this Court finds that Puerto Rico law controls the question of whether SIGCo, as a non-signatory, is bound by the P&I Policy.

Puerto Rican law generally favors arbitration. _See_ Quiñones-González, 161 D.P.R. 668; _see also_ 32 P.R. Laws Ann. § 3201. "The Supreme Court of Puerto Rico has reiterated in many occasions that the PRCAA embodies a vigorous policy favoring arbitration and that all doubts about the existence of arbitration must be resolved in favor of that proceeding." Garrison v. Palmas Del Mar Homeowners Ass'n, Inc., 538 F. Supp. 2d 468, 476 (D.P.R. 2008)(_citing_ Medina Betancourt et al. v. Cruz Azul de P.R., 155 D.P.R. 735, 738, 2001 WL 1617211) (2001). But under the Puerto Rico Commercial Arbitration Act (32 P.R. Laws Ann. § 3201 _et seq._), "the arbitration mechanism is to be employed only if agreed by the parties and in the manner agreed upon." Thus, "a dispute's arbitrability, that is, the finding of whether an agreement binds the parties to arbitrate a given controversy, is a judicial task." Garrison v. Palmas Del Mar Homeowners Ass'n,

Civil No. 21-1594(GMM)
Page -21-

Inc., 538 F.Supp.2d 468, 476 (D.P.R. 2008) (*citing* Crufon Const.
v. Autoridad Edificios Públicos*,* 156 D.P.R. 197, 202 (2002)). In
ascertaining the meaning of a Contract, Section 3472 of the Puerto
Rico Civil Code states that "attention must principally be paid to
their acts, contemporaneous and subsequent to the contract." P.R.
Laws Ann, tit. 31, § 3472.

In evaluating the intent of the parties in the present
case, this Court will look to First-Circuit precedent applying
the doctrine of direct benefits estoppel to ascertain whether
SIGCo intentionally embraced and benefited from the P&I Policy
to the extent that principles of equity bind SIGCo to the
Policy's arbitration term.

The First Circuit has stated that "of course, as a general
proposition, a contract [for arbitration] cannot bind a non party."
Grand Wireless, Inc. v. Verizon Wireless, Inc., 748 F.3d 1, 9 (1st
Cir. 2014). But, "[a] non-signatory may be bound by or acquire
rights under an arbitration agreement under ordinary state-law
principles of agency or contract." Id. at 9-10 (*quoting* Restoration
Pres. Masonry, Inc. v. Grove Eur. Ltd., 325 F.3d 54, 62 n. 2 (1st
Cir. 2003)). Nevertheless, the First Circuit advised that "courts
should be extremely cautious about forcing arbitration in
situations in which the identity of the parties who have agreed to
arbitrate is unclear." Cabrera-Morales v. UBS Trust Co., 769

Civil No. 21-1594(GMM)
Page -22-

F.Supp.2d 67, 71 (D.P.R. 2011) (*citing* <u>InterGen N.V.</u>, 344 F.3d at 143).

   An arbitration clause may be enforced against a non-signatory party in "cases [that] involve non-signatories who, during the life of the contract, have embraced the contract despite their non-signatory status but then, during litigation, attempt to repudiate the arbitration clause in the contract." <u>InterGen N.V.</u>, 344 F.3d at 145 (*quoting* <u>E.I. DuPont de Nemours & Co. v. Rhone Poulenc Fiber & Resin Intermediates, S.A.S.</u>, 269 F.3d 187, 200 (3d Cir. 2001)); *see also* <u>Am. Bureau of Shipping v. Tencara Shipyard S.P.A.</u>, 170 F.3d 349, 353 (2d Cir. 1999); <u>Med. Air Tech. Corp. v. Marwan Inv., Inc.</u>, 303 F.3d 11, 18 (1st Cir. 2002). On this basis, "a party may be estopped from asserting that the lack of his signature on a written contract precludes enforcement of the contract's arbitration clause when he has consistently maintained that other provisions of the same contract should be enforced to benefit him." <u>InterGen N.V.</u>, 344 F.3d at 145 (*quoting* <u>Int'l Paper Co. v. Schwabedissen Maschinen & Anlagen GMBH</u>, 206 F.3d 411, 418 (4th Cir. 2000)).

   In <u>Cabrera-Morales</u>, this District Court cited instances in which Circuit courts suggested that a non-signatory party might be found to have exhibited sufficient exploitation of an agreement to be bound by its terms. *See* <u>Cabrera-Morales</u>, 769 F.Supp.2d at 72. For example, in <u>Bridas S.A.P.I.C. v. Gov't of Turkmenistan</u>, 345

Civil No. 21-1594(GMM)
Page -23-

F.3d 347, 362 (5th Cir. 2003), the Fifth Circuit stated that when the non-signatory party brought suit under the agreement at issue, it constituted exploitation for equitable estoppel purposes. Analogously, the Fourth Circuit determined that a non-signatory was estopped from avoiding an agreement's arbitration clause when its "entire case hinge[d] on its asserted rights under" the agreement containing the arbitration clause. *See* Int'l Paper Co., 206 F.3d at 418; *see also* Ribadeneira v. New Balance Ath., Inc., 65 F.4th 1, 21 (1st Cir. 2023) (*quoting* MAG Portfolio Consult, GMBH v. Merlin Biomed Grp. LLC, 268 F.3d 58, 61 (2d Cir. 2001) (stating that a non-signatory may be bound when it "knowingly exploit[ed] an agreement with an arbitration clause," such as by "'knowingly accept[ing] the 'direct' benefits' of such an agreement"). Conversely, the party should not be bound when gaining an indirect benefit "where the non-signatory exploits the contractual relation of parties to an agreement but does not exploit (and thereby assume) the agreement itself." MAG Portfolio Consult, GMBH, 268 F.3d at 61.

Thus, when non-signatories' causes of action are borne of a contract containing an arbitration term, courts have concluded that those parties which have actively exploited the contract, are thus also bound by all its terms. Most recently, the First Circuit concluded that direct benefits estoppel applied to prevent a non-signatory owner of a sporting goods company from avoiding a

Civil No. 21-1594(GMM)
Page -24-

contract's arbitration term. *See* Ribadeneira, 65 F.4th 1. There, the owner, who had been assigned legal rights to a claim by the company, sought injunction against the shoemakers based on the argument that a distribution agreement between the shoemaker and the sporting goods company was enforceable and that the shoemaker had violated its terms. Id. at 8. When the shoemaker subsequently sought to initiate arbitration proceedings against the owner, the owner argued that since he was only an assignee to the agreement's legal claims and not a signatory to the distribution contract, he could not be bound by its arbitration term. Id. at 9. The First Circuit disagreed stating that "Ribadeneira sought to legally enforce. . .a claim under that contract. Because he sought to enforce the terms of the New Agreement, thereby knowingly receiving a direct benefit from that contract, we conclude that Ribadeneira was estopped from avoiding that putative contract's arbitration clause, despite his non-signatory status." Id. at 26-27.

Analogous to Ribadeneira, courts have bound non-signatory parties to an arbitration term in cases where said parties legally invoked the contract. *See e.g.* Hughes Masonry Co. v. Greater Clark County School Bldg. Corp, 659 F.2d 836, 838-39 (7th Cir. 1981) (finding a non-signatory party to be bound by an arbitration agreement after that same party invoked the agreement to show that a signatory party failed to perform its contractual duties); Int'l Paper Co., 206 F.3d at 411 (binding a non-signatory party under an

Civil No. 21-1594(GMM)
Page -25-

arbitration term of a contract that said party used to bring claims that a signatory party failed to honor warranties contained in the contract).

Conversely, when non-signatories' disputes arise independent of a contract containing an arbitration term, courts have refused to bind those parties to the terms of the contract. *See e.g.* InterGen N.V., 344 F.3d at 140 (finding that a non-signatory party did not benefit from a contract when their claims against a signatory party "neither sought to recover for breach of contract nor to enforce any contractual right."); Cabrera-Morales, 769 F.Supp. 2d at 71 (finding that a non-signatory trust beneficiary plaintiff suing trustees for breach of fiduciary duty and duty of loyalty was not bound by an arbitration clause in the agreement between the trustees and their financial advisor).

Applying the direct benefits theory of equitable estoppel, this Court finds that Steamship has met the burden of demonstrating that SIGCo exploited the P&I Contract in a manner that merits recharacterizing it as a party that can be bound to the arbitration term of the Policy. SIGCo's cause of action against Steamship is rooted in and dependent upon the P&I Policy. SIGCo is not bringing suit against Steamship on non-contractual grounds but is relying on the terms of the Policy to provide it with financial compensation should the United States be awarded damages against SIGCo under OPA. As such, the Court concludes that SIGCo seeks to

Civil No. 21-1594(GMM)
Page -26-

derive both a legal cause of action and potential future financial benefits from the terms of the P&I Policy and should thus be estopped from avoiding the other provisions in the Policy that it finds less advantageous.

2.   The Scope of the P&I Policy's arbitration clause

Having determined that SIGCo can be bound to the arbitration term in the P&I Policy, the Court considers whether all of SIGCo's claims are captured by the P&I Policy's arbitration term. In SIGCo's complaints against Steamship, it seeks to subrogate Margara's insurance claims against Steamship arising from the P&I Policy and be guaranteed contributions to any damages it must pay to the United States arising from the Margara's grounding. The arbitration term contained in Rule 47 of the P&I Policy Rules for 2006-2007 provides

> In the event of any difference or dispute whatsoever, between or affecting a Member and the Club and concerning the insurance afforded by the Club under these rules or any amounts due from the Club to the Member or the Member to the Club, such difference or dispute shall in the first instance be referred to adjudication by the Directors . . . If the Member does not accept the decision of the Directors, or if the Managers, in their absolute discretion, so decide, the difference or dispute shall be referred to the arbitration of three arbitrators, one to be appointed by each of the parties and the third by the two arbitrators so chosen, in London. As this Court previously noted, Puerto Rican law governs the determination of the contents of an arbitration agreement.

(Docket No. 87-3 at 82). (emphasis supplied). Steamship argues that the language of Rule 47 covering "any difference or dispute"

Civil No. 21-1594(GMM)
Page -27-

is sufficiently broad to encompass all SIGCo's claims. (Docket No. 87 at 14-15). SIGCo disagrees, finding that its direct-action claims are not differences or disputes between "a Member and the Club." (Docket 121 at 25).

As noted, the determination of the arbitrability and scope of an arbitration contract are matters of state law. The Puerto Rico Supreme Court has held that "it is incumbent upon the court to examine the parties' intention to determine which controversies they had agreed to submit to arbitration. . ." Crufon Const. v. Aut. Edif. Pubs., 156 D.P.R. 197, --- P.R. Offic. Trans. --- (2002). Under Puerto Rico contract law, courts look to the plain language of a contract to ascertain its intended scope. 31 P.R. Laws § 3471 ("If the terms of a contract are clear and leave no doubt as to the intentions of the contracting parties, the literal sense of its stipulations shall be observed."); see also Littlefield v. Acadia Ins. Co., 392 F.3d 1 (1st Cir. 2004) (citing 2 Lee R. Russ, Couch on Insurance § 22:43 (3d ed. 1995)) ("Since it must be assumed that each word contained in an insurance policy is intended to serve a purpose, every term will be given effect if that can be done by any reasonable construction.").

The Court finds that the plain language of the clause covers "any difference or dispute whatsoever, between or affecting a Member and the Club and concerning the insurance afforded by the Club." (Docket No. 87-3 at 82). Considering that SIGCo's causes of

Civil No. 21-1594(GMM)
Page -28-

action against Steamship arise from the insurance agreement between Steamship's members, Margara and EJ, and Steamship itself, the Court finds SIGCo's contention that its claims are outside the scope of the arbitration term unconvincing. Clearly, any dispute between SIGCo and Steamship regarding the distribution of Steamship's insurance compensation or coverage obligations can be considered as "affecting" Steamship and one or more of its members. Based on the plain language of the Policy and Puerto Rico principles of contract law, the Court finds that all SIGCo's claims fall within the scope of the Policy's arbitration provision.

Having concluded that the arbitration clause in the Policy is arbitrable and validly enforceable against SIGCo, the Court concludes that the New York Convention controls this case. *See* Green Enters., LLC, 2021 U.S. Dist. LEXIS 112989, at *13; Ledee, 528 F.Supp. at 245. Although 26 P.R. Laws Ann. § 2003 establishes that "[t]he direct-action against the insurer may only be exercised in Puerto Rico," the New York Convention requires the enforcement of International Arbitration Agreements by their terms. The P&I Policy states that any "difference or dispute shall be referred to the arbitration. . .in London." Thus, the Court concludes that SIGCo must adhere to all the Policy's terms pursuant to the New York Convention and is compelled to arbitrate the case in London. In concurrence with this determination, the Court also finds it

Civil No. 21-1594(GMM)
Page -29-

appropriate to stay the present action pending arbitration between SIGCo and Steamship under the Policy.

## VI.    CONCLUSION

For the reasons stated above, Steamship's *Motion to Compel Arbitration* and *Motion to Stay* (Docket No. 87) is **GRANTED** and SIGCo's *Motion for Oral Argument* (Docket No. 132) is **rendered moot.** The Court thus stays SIGCo's third-party claims against Steamship pending arbitration.

IT IS SO ORDERED.

In San Juan, Puerto Rico, September 26, 2023.

<u>s/Gina R. Méndez-Miró</u>
GINA R. MÉNDEZ-MIRÓ
UNITED STATES DISTRICT JUDGE